AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Eastern District of California



**FILED**

Apr 07, 2021

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No.   2:21-mj-0056 CKD |
| | ) | |
| Parampreet SINGH, Ranvir SINGH and Amandeep MULTANI | ) | **SEALED** |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___August 25, 2020 through the present date___ in the county of ___Sacramento___ in the ___Eastern___ District of ___California___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|

COUNT ONE –  21 U.S.C. §§ 841(a)(1) and 846 - Conspiracy to Distribute and Possess with Intent to Distribute at Least 5 Kilograms of a Mixture and Substance Containing a Detectable Amount of Cocaine; Heroin; Opium; and Ketamine (August 25, 2020 through the present).

COUNT TWO –  21 U.S.C. § 841(a)(1) - Distribution of at Least 500 Grams of a Mixture and Substance Containing a Detectable Amount of Cocaine (March 11, 2021).

This criminal complaint is based on these facts:

(see attachment)

☒  Continued on the attached sheet.

/s/
*Complainant's signature*

DEA Special Agent Joshua Matas
*Printed name and title*

Sworn to me and signed telephonically.

Date: ___April 7, 2021 at  8:01 am___

*Judge's signature*

City and state:  ___Sacramento, California___

Carolyn K. Delaney, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS AND CRIMINAL COMPLAINT

I, Joshua Matas, being duly sworn, depose and state as follows:

### Background and Expertise

1.   I am a Special Agent with the Drug Enforcement Administration ("DEA"), Sacramento District Office, and have been so employed since 2018.  As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing criminal laws and duly authorized by the Attorney General to request a search warrant.  I am responsible for conducting investigations into narcotics traffickers and assisting in their apprehension. These investigations are conducted both in an undercover and overt capacity and involve electronic surveillance, cellphone-location evidence, confidential informants, and the execution of search and arrest warrants. Prior to becoming a DEA Special Agent, I graduated from the University of Florida with a Bachelor's of Science in Chemical Engineering in 2012.  Upon being hired by DEA I completed a four-month DEA Basic Agent School at Quantico, Virginia.  After completing DEA Basic Agent School in September 2018, I was assigned to the Sacramento District Office.

2.   I was trained as a DEA Special Agent at the DEA Academy, Quantico, Virginia. During my training, I received special training in the Controlled Substance Act, Title 21 United States Code, including but not limited to, Sections 841(a)(1) and 846, Controlled Substance Violations and Conspiracy to Commit Controlled Substance Violations, respectively.  I have received special training regarding criminal organizations engaged in conspiracies to manufacture and/or possess with intent to distribute methamphetamine, cocaine, cocaine base, heroin, marijuana, MDMA, fentanyl, and other dangerous drugs prohibited by law.  I received further training in search and seizure law, financial investigations and money laundering techniques, and many other facets of drug law enforcement.  I have also spoken to and worked with experienced federal, state, and municipal agents and narcotics officers regarding the methods and means employed by drug manufacturers and drug traffickers.

3.   During the course of my employment as a DEA Special Agent, I have participated in numerous criminal investigations.  I have participated in executing numerous Federal and State search warrants involving controlled substances, the seizure of narcotics-related records and other types of evidence that document the activities of criminal organizations in both the manufacturing and distribution of controlled substances.  To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance, and various types of infiltration, including undercover agents, informants, and cooperating sources. I have participated in multiple investigations targeting individuals and organizations trafficking cocaine, heroin, marijuana, methamphetamine, fentanyl, and other drugs.

4.  Through my training, experience, and interaction with other experienced Special Agents, Task Force Agents, and other drug investigators, I have become familiar with the

1

methods employed by drug traffickers to smuggle, safeguard, store, transport, and distribute drugs, to collect and conceal drug related proceeds, and to communicate with other participants to accomplish such objectives. These methods include the use of telephones, pre-paid or debit calling cards, public telephones, wireless communications technology such as paging devices and cellular telephones, counter-surveillance, elaborately planned smuggling schemes tied to legitimate businesses, and use of codes in communications in an attempt to avoid detection by law enforcement. Based on my training and experience, I also know that violators of the controlled substances laws often purchase telephones or subscribe to telephone service using false names and/or other individuals' names to avoid detection by law enforcement.

### Scope of Requested Search Warrants

5.  This affidavit supports an application for warrants to search the locations and vehicles further described below and in **Attachments A-1 through A-9**. The contraband, objects, and information for which we will search are described in **Attachment B**. Attachments A-1 through A-8 and Attachment B are incorporated by reference.

6.  This Affidavit is submitted in support of warrants to search the following locations and vehicles:

   a.  The residence located at **3001 Goshawk Street, Davis, California** ("**Target Location 1**"), as described in Attachment A-1;

   b.  The residence located at **1710 Baines Avenue, Sacramento, California** ("**Target Location 2**"), as described in Attachment A-2;

   c.  The residence located at **2209 Stansfield Drive, Roseville, California** ("**Target Location 3**"), as described in Attachment A-3;

   d.  The commercial property located at **847 Harbor Boulevard, West Sacramento, California ("Target Location 4")** as described in Attachment A-4;

   e.  The following vehicles:

   1.  2003 HUMMER SUV, Maroon with CA license #PJB37 ("**Target Vehicle 1**"), as described in Attachment A-5.
       a.  Registered to Parampreet SINGH at 847 Harbor Boulevard, West Sacramento, California
       b.  Parked at 847 Harbor Boulevard (suspected stash location) and 2393 Alta Garden Lane corresponding to geo-location data generated from telephone number 209-500-0001, which is used by Parampreet SINGH

   2.  2019 AUDI sedan, Blue with CA license #SLOWA5 ("**Target Vehicle 2**"), as described in Attachment A-6.

      a.  Registered to Parampreet SINGH at 847 Harbor Boulevard, West Sacramento, California

      b.  Parked at Target Location 1 and Target Location 4 corresponding to geo-location data generated from telephone number 209-500-0001, which is used by Parampreet SINGH

3.    2015 Volkswagen SUV, Blue with CA license #8SSC112 ("**Target Vehicle 3**"), as described in Attachment A-7.

      a.  Registered to Manit MULTANI at 7871 Mission Grove Parkway S, Apt 115, Riverside, California

      b.  Driven by Amandeep MULTANI and Ranvir SINGH to and from 1 KG cocaine deal

4.    2015 Toyota sedan, White with CA license #7NTH692 ("**Target Vehicle 4**"), as described in Attachment A-8

      i.  Registered to Ranvir SINGH at 1710 Baines Avenue, Sacramento, CA

      ii.  Parked at Target Location 2 and 2393 Alta Garden Lane

5.    2016 Mercedes SUV, White with CA license #PB711 ("**Target Vehicle 5**") as described in Attachment A-9.

      a.  Registered to Sarbjit SINGH at 1710 Baines Avenue, Sacramento, California

      b.  Driven by Ranvir SINGH and parked at **Target Location 2**

7.   I request authority to search **Target Locations 1, 2, 3 & 4** and **Target Vehicles 1, 2, 3, 4, & 5** for the items described in **Attachment B**.

## <u>Scope of Requested Criminal Complaint</u>

8.  This affidavit also supports an application for a criminal complaint and arrest warrants for:

      a.  Parampreet SINGH
         (Counts 1-2)

      b.  Ranvir SINGH
         (Counts 1-2)

      c.  Amandeep MULTANI
         (Counts 1-2)

<u>COUNT ONE</u> –    Conspiracy to Distribute and Possess with Intent to Distribute at Least 5 Kilograms of a Mixture and Substance Containing a Detectable Amount of Cocaine; Heroin; Opium; and Ketamine, in

violation of 21 U.S.C. §§ 841(a)(1) and 846 (August 25, 2020 through the present).

COUNT TWO –     Distribution of at Least 500 Grams of a Mixture and Substance Containing a Detectable Amount of Cocaine, in violation of 21 U.S.C. § 841(a)(1) (March 11, 2021).

9. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## Statement of Probable Cause

### Background and Overview of Investigation

10. In October 2020, I was contacted by DEA Ottawa Country Office ("CO") agents regarding the drug trafficking activities of Parampreet SINGH, Ranvir SINGH and Amandeep MULTANI in Sacramento, CA. The DEA Ottawa CO agents advised that in June 2020, they began investigating members of the Parampreet SINGH drug trafficking organization ("DTO"), which they later found is based in Sacramento, CA and extends to the greater Toronto, Canada metropolitan area. The DEA Ottawa CO investigators further advised that the York Regional Police (a Canadian police department in the greater Toronto area), is utilizing a police officer acting in an undercover capacity ("UC-1") to directly communicate with DTO members, who are involved in facilitating the trafficking of cocaine, heroin, opium, and ketamine across international borders. The York Regional Police have received assistance in their investigation from other law enforcement agencies, including the Royal Canadian Mounted Police and the DEA.

11. The investigation has led to the identification of multiple members of the DTO and their methods of communication, including the telephone numbers used by multiple DTO members. The investigators have been able to successfully coordinate multiple undercover purchases of kilogram quantity amounts of cocaine, opium, and ketamine, a schedule III controlled substance, in the greater Toronto, Canada area; and a kilogram of cocaine in Sacramento, California. These purchases were brokered through communications with Parampreet SINGH, MULTANI, and/or Ranvir SINGH, some of the details of which are described below.

12. During their communications with UC-1 and other undercover officers, as further detailed below, Parampreet SINGH, MULTANI, and/or Ranvir SINGH have offered to supply up to hundreds of kilograms of cocaine, heroin, opium, and ketamine at a time, in both Canada and the United States. They have also stated that they have drug trafficking connections to Mexico, India, Pakistan, Afghanistan, and Germany, in addition to the United States and Canada.

*Introduction of UC-1 to Parampreet SINGH in August 2020*

13.   On June 2, 2020, UC-1 was in contact with a Canada-based DTO member and engaged in drug-related conversations detailing the price of a kilogram of cocaine at $60,000 Canadian dollars ("CAD").   The DTO member told UC-1 that his drug link in the United States was "Dudi" (later identified as Parampreet SINGH), who was based out of California.   The DTO member gave UC-1 a phone number for Parampreet SINGH, 661-510-3143, to facilitate further conversations detailing drug trafficking logistics.

14.   On August 25, 2020, UC-1 initially contacted Parampreet SINGH at 661-510-3143.[1] UC-1 asked the user if he was Dudi, and the user confirmed he was.   Parampreet SINGH further communicated with UC-1 on this day by calling from a second device with phone number 209-500-0001.   While using 209-500-0001, Parampreet SINGH told UC-1 that he resided in Davis, California.   When UC-1 requested information on sourcing some "stuff" (referring to narcotics), Parampreet SINGH advised he would call back at a later date.

15.   On September 20, 2020, UC-1 contacted Parampreet SINGH utilizing WhatsApp at phone number 209-500-0001.   Parampreet SINGH advised there was a shipment of opium arriving in Vancouver consisting of 25-30 "pieces," which UC-1 understood to refer to kilograms.   Parampreet SINGH said he wished that UC-1 would coordinate a pick-up of this shipment with his Canada-based counterparts.

16.   Further conversation with Parampreet SINGH occurred between the dates of September 20, 2020 and October 18, 2020.   During these conversations, Parampreet SINGH related that there was cocaine available for sale at $33,000 USD and that there were 25 kilograms of heroin for sale.   Parampreet SINGH continued engaging in drug-related conversations while using 209-500-0001, in which he advised UC-1 that there was more money to be made if pick up of the cocaine was arranged in California.   Parampreet SINGH also advised UC-1 to download another encrypted messaging application BOTIM. Based on my training and experience, I believe SINGH's consistent use of encrypted apps shows his level of expertise in his attempts to avoid detection of his drug-related conversations by law enforcement.

### *Controlled Purchase of approximately 1 kilogram of Ketamine in Brampton, Canada, on October 21, 2020, coordinated by Parampreet SINGH and Ranvir SINGH*

17.   In October 2020, Parampreet SINGH stated that he had a contact in possession of 200 kilograms of ketamine.   Parampreet SINGH asked UC-1 if somebody would buy the ketamine for "40" a piece, believed to mean $40,000 per kilogram of Ketamine. Parampreet SINGH then passed UC-1 a phone number, 253-205-6137, for his "cousin" whom he referred to as "Lally," and who was later identified as Ranvir SINGH.

---

[1] The communications between UC-1 and SINGH have occurred primarily in the Punjabi language, as well as in English and Spanish at times.  The descriptions of these communications in this Affidavit are based on reports prepared by UC-1, summarizing in English UC-1's communications with SINGH.

Parampreet SINGH told UC-1 that Ranvir SINGH would handle the drug deal related to the purchase of ketamine. On October 19, 2020, UC-1 spoke with Ranvir SINGH on BOTIM over 253-205-6137. During this conversation, Ranvir SINGH asked if UC-1 wanted to buy two pieces of ketamine, to which UC-1 advised he only wanted to purchase one sample kilogram.[2] Ranvir SINGH then confirmed that he had a lot of pieces and that on the day of the drug buy, he would have his guy contact UC-1 via WhatsApp. The coordination efforts of UC-1 with Parampreet SINGH and Ranvir SINGH resulted in the purchase of approximately 1 kilogram of ketamine in Brampton, Ontario, Canada (a suburb of Toronto) on October 21, 2020, for $23,000 USD and $8,100 CAD.

### *Surveillance Regarding Parampreet SINGH and Ranvir SINGH*

18. On November 2, 2020, a search warrant to obtain precise location data from 209-500-0001 was signed by the Honorable Kendall J. Newman. Investigators received precise location data from 209-500-0001 from November 5, 2020 to December 2, 2020. The data generated from this search warrant revealed that the user of the telephone frequents a residence in the area of 3001 Goshawk Street, Davis, California (**Target Location 1**), which is known to be associated with Parampreet SINGH. The data also showed the user of 209-500-0001 in the area of 847 Harbor Blvd, West Sacramento, California (**Target Location 4**), which is a commercial property associated with Parampreet SINGH.

19. On November 2, 2020, investigators conducted drive-by surveillance of the residence located at 3001 Goshawk Street, Davis, California (**Target Location 1**) and observed a blue Audi sedan bearing a California license plate of SLOWA5 (**Target Vehicle 2**), registered to Parampreet SINGH at 847 Harbor Blvd, West Sacramento, California (**Target Location 4**).

20. On November 6, 2020, at approximately 4:35 pm investigators conducted drive-by surveillance at 847 Harbor Blvd, West Sacramento (**Target Location 4**). Investigators observed a Hummer SUV bearing personalized plate PJB37 (**Target Vehicle 1**), registered to Parampreet SINGH at 847 Harbor Blvd, West Sacramento, California (**Target Location 4**). The precise location data provided on November 6, 2020 between the times of 4:30 pm & 4:44 pm show 209-500-0001 located within approximately 330 meters of 847 Harbor Blvd, West Sacramento, California (**Target Location 4**).

21. On November 13, 2020, investigators conducted a drive by surveillance at 1710 Baines Avenue, Sacramento, CA (**Target Location 2**); an address associated with Ranvir SINGH. The residence is a standalone single-family residence displaying numbers "1710" next to the garage door entrance. The residence is located on the southwest corner of the intersection of Baines Avenue and Blackrock Drive. Investigators observed a white Toyota Camry bearing CA license plate 7NTH692 (**Target Vehicle 4**) (valid, registered to

---

[2] The communications between UC-1 and Ranvir SINGH have occurred primarily in the Punjabi language. The descriptions of these communications in this Affidavit are based on reports prepared by UC-1, summarizing in English UC-1's communications with Ranvir SINGH.

Ranvir SINGH at 1710 Baines Avenue, Sacramento, CA) parked in the driveway of 1710 Baines Avenue.

22.  On December 4, 2020, investigators conducted surveillance of Ranvir SINGH at 1710 Baines Avenue, Sacramento, California (**Target Location 2**).  Investigators observed two vehicles parked in the residence driveway facing in the direction of the garage door; a white 2016 Mercedes SUV with a personalized California license plate PB711 (**Target Vehicle 5**), which is registered to Sarbjit SINGH at 1710 Baines Avenue, Sacramento, CA and a white 2015 Toyota Camry with California license plate 7NTH692 (**Target Vehicle 4**) which is registered to Ranvir SINGH at 1710 Baines Avenue, Sacramento, CA. At approximately 9:50 am, investigators observed a male, wearing a blue hooded sweater and jeans, exit the residence while talking on a cellphone and enter the driver's side door of the Mercedes SUV parked in the driveway.  Surveillance then observed the Mercedes back out of the driveway and travel westbound on Baines Avenue. Surveillance members followed the Mercedes from the residence and visually confirmed the driver of the Mercedes as Ranvir SINGH by comparing the driver's appearance to that of the photograph on record for Ranvir SINGH's California driver's license. During this surveillance operation, investigators lost visual of Ranvir SINGH's vehicle while in transit. At approximately 12:20 pm, investigators conducted an address check at an apartment complex located at 2393 Alta Garden Lane, Sacramento, CA which is an address related to Ranvir SINGH through his business affiliation of Miri Piri Transportation INC. The white Mercedes driven by Ranvir SINGH earlier in the day was observed by investigators parked directly in front of 2393 Alta Garden Lane. Investigators observed Ranvir SINGH repeatedly appear from the front door area related to 2393 Alta Garden Lane until the surveillance was terminated.

### *Controlled Purchase of 1 kilogram of ketamine in Brampton, Canada on November 13, 2020, coordinated by Parampreet SINGH and Ranvir SINGH*

23.  On November 10-13, UC-1 engaged in numerous communications with Parampreet SINGH at 209-500-0001 and Ranvir SINGH at 253-205-6137 regarding a purchase of 1 kilogram of ketamine, which resulted in the purchase of approximately 1 kilogram of ketamine on November 13, 2020, in Brampton, Canada for $20,000 CAD, with $13,000 CAD to be paid later.

### *Controlled Purchase of 1 kilogram of purported ketamine in Brampton, Canada on December 3, 2020, coordinated by Parampreet SINGH and MULTANI*

24. On December 3, 2020, UC-1 contacted Parampreet SINGH via the encrypted text messaging application BOTIM at 209-500-0001 to coordinate the purchase of approximately 1 kilogram of ketamine in Canada.  Parampreet SINGH then passed a number to the UC for "his guy," later identified as Amandeep MULTANI, using 732-705-0883, who would facilitate the completion of the drug buy of approximately 1 kilogram of ketamine for $33,000 CAD in Brampton, Canada later that day.  Following extensive communications with MULTANI (who told UC-1 he was in California) regarding the details and security measures for the transaction, UC-1 purchased approximately 1

kilogram of purported ketamine for $33,000 in Brampton, Canada, from a Canada-based DTO member taking directions from MULTANI.[3]  Subsequent lab testing in Canada revealed the purported ketamine in fact contained *Diphenhydramine*, a non-controlled substance that is one of the primary active ingredients in Benadryl.

### *Controlled Purchase of 1 kilogram of Ketamine and sample of Heroin in Canada on December 9, 2020, facilitated by Parampreet SINGH and MULTNAI*

25. On December 8, 2020, UC-1 had a conversation with Parampreet SINGH at 209-500-0001 via BOTIM.  Parampreet SINGH advised UC-1 to contact the previous connection, which UC-1 understood to mean MULTANI.

26.  Minutes later, UC-1 was contacted by MULTANI via WhatsApp using 732-705-0883.  MULTANI asked UC-1 if they were ready to which the UC responded that they would be ready the next day on December 9, 2020.  MULTANI told UC-1 that he would be meeting the "same guy" and that the driver was only available during the evenings. MULTANI then told UC-1 that "Paji", believed to be referring to Parampreet SINGH, told him what UC-1 was looking for. MULTANI said he would get good pricing for both, believed to be referring to cocaine and heroin.

27.  On December 9, 2020, UC-1 again spoke to Parampreet SINGH via BOTIM at 209-500-0001.  Parampreet SINGH told UC-1 that his father was sick and that he would be visiting India.  Parampreet SINGH told UC-1 that the person whom UC-1 spoke with previously (understood to refer to MULTANI) was the guy who connects people from India, Afghanistan, Germany, the United States and Canada. Parampreet SINGH further explained that UC-1 should keep MULTANI happy. Parampreet SINGH further stated that the people in UC-1's "village" (i.e., the Toronto area) have 100 pieces (understood to mean kilograms) of "kala" (black in Punjabi, understood to mean opium).

28.  Later that day, UC-1 engaged in extensive communications with MULTANI over 732-705-0883, which resulted in the purchase of approximately 1 kilogram of purported ketamine and a sample of heroin from the DTO member who delivered the ketamine on December 3, and who was being directed by MULTANI, for $33,000 CAD in Brampton, Canada. Subsequent lab testing in Canada revealed the purported ketamine in fact contained *Dephenhydramine* and confirmed the heroin sample to be heroin.

### *Parampreet SINGH Informs UC-1 He has 100-200 kilograms of Cocaine Available*

29. On December 23, 2020, Parampreet SINGH used 209-500-0001 to contact UC-1 via the BOTIM application.  The two spoke about whether UC-1 wanted to purchase more ketamine.  UC-1 expressed concerns about the previous purchases because of the quality of the product.  Parampreet SINGH advised UC-1 that he would secure a new price of

---

[3] The communications between UC-1 and MULTANI have occurred primarily in the Punjabi language.  The descriptions of these communications in this Affidavit are based on reports prepared by UC-1, summarizing in English UC-1's communications with MULTANI.

$25,000 per kilogram of ketamine.  Parampreet SINGH then stated that he had arranged for 100 to 200 "trucks," which UC-1 understood to mean kilogram units of cocaine, to be delivered to Canada.  Parampreet SINGH stated that they were "39," believed to mean $39,000 USD per kilogram of cocaine.  Parampreet SINGH confirmed that the shipment would be originating from California.

### *Controlled Purchase of 1 kilogram of Ketamine in Toronto, Canada, on December 29, 2020, coordinated by Parampreet SINGH*

30.  On December 29, 2020, UC-1 purchased approximately 1 kilogram of ketamine for $25,000 CAD in Toronto, Canada, in a deal arranged by Parampreet SINGH using 209-500-0001.

### *Controlled Purchases of 1.5 kilograms of Opium in Brampton, Canada, on January 7, 2021, coordinated by MULTANI*

31.  On January 7, 2021, UC-1 purchased approximately 1.5 kilograms of opium in Canada for a total of $33,500 CAD, in two separate transactions (of approximately 900 grams and 600 grams respectively) that UC-1 negotiated with MULTANI.

### *Controlled Purchase of 1 kilogram of Cocaine in the greater Toronto area, Canada, on January 27, 2021, facilitated by Parampreet SINGH and MULTANI*

32.  On January 27, 2021, UC-1 purchased approximately 1 kilogram of cocaine in Canada for $60,000 CAD, in a deal arranged by MULTANI.  The next day, UC-1 communicated with Parampreet SINGH via a BOTIM call.  Parampreet SINGH asked how much UC-1 sold the cocaine for from the deal the previous day, and UC-1 said $70,000 and that they each made $5,000 (UC-1 and Parampreet SINGH), according to a 50/50 profit sharing arrangement they had previously discussed.  Parampreet SINGH then vouched for MULTANI and said that MULTANI would provide more work (understood to be a reference to cocaine), upwards to 30 kilograms.  UC-1 responded that UC-1's buyers would be requesting that amount.

### *Controlled Delivery of $6,300 USD broker fee to Parampreet SINGH and MULTANI in Sacramento, CA on February 3, 2021*

33.  UC-1 arranged for the delivery of $6,300 USD to Parampreet SINGH in Sacramento, California, on February 3, 2021, as partial payment for approximately 2 kilograms of ketamine and 1.5 kilograms of opium previously purchased in Canada on November 8, 2020 (ketamine), December 9, 2020 (ketamine), and January 7, 2021 (opium).  A second undercover officer ("UC-2") delivered the broker fee to Parampreet SINGH on behalf of UC-1.  During this meeting in Sacramento, California, investigators positively identified Parampreet SINGH as the individual who met with UC-2. Investigators also observed Parampreet SINGH depart as a passenger in a Volkswagen SUV bearing a California license plate 8SSC112 (**Target Vehicle 3**).  Investigators identified the driver of the Volkswagen SUV as MULTANI via a photograph provided from a DHS-HSI database

check. Investigators then followed **Target Vehicle 3** back to 2393 Alta Garden Lane, Sacramento, CA.  Surveillance members observed MULTANI and Parampreet SINGH exit the vehicle and observed MULTANI walk up a sidewalk toward the condominium at 2393 Alta Garden Lane, on the north side of the condominium complex. MULTANI walked north up the second sidewalk west of the condominium complex entrance. At the same approximate time, Parampreet SINGH walked to a red Hummer SUV parked furthest away from the Volkswagen and briefly did something near the driver's side door. Investigators subsequently identified the license plate of this vehicle as PJB37 (2003 Hummer, valid, registered to Parampreet SINGH at 847 Harbor Blvd., West Sacramento, CA) (**Target Vehicle 1**). Moments later, Parampreet SINGH walked up the same sidewalk, passing MULTANI, who briefly returned to **Target Vehicle 3** and appeared to retrieve something from the vehicle before returning back up the same sidewalk.

### *Controlled Purchase of 1 Kilogram of Cocaine in Brampton, Canada, on February 12, 2021, coordinated by MULTANI*

34.  On February 12, 2021, UC-1 purchased approximately 1 kilogram of cocaine in Brampton, Canada for $60,000 CAD, in a deal arranged by MULTANI.

### *Surveillance Regarding MULTANI and Parampreet SINGH*

35.  On February 23, 2021, a search warrant to obtain precise geo-location data of MULTANI's telephone number 732-705-0883 was signed by the Honorable Deborah Barnes. Between March 3 and March 24, 2021, investigators analyzed the geo-location of 732-705-0883, which frequented the area of properties previously identified as related to the DTO: 2393 Alta Garden Lane, Sacramento, CA and 847 Harbor Boulevard, West Sacramento, CA (**Target Location 4**).

36.  On March 5, 2021, a search warrant to obtain precise geo-location data of 209-500-0001, used by Parampreet SINGH, was signed by the Honorable Deborah Barnes. Between March 8 and March 24, 2021, investigators analyzed the geo-location data of 209-500-0001 (Parampreet SINGH), which frequented the area of properties previously identified as related to Parampreet SINGH: 3001 Goshawk Street, Davis, CA (**Target Location 1**) and 847 Harbor Boulevard, West Sacramento, CA (**Target Location 4**).

### *Controlled Purchase of 1 kilogram of cocaine coordinated by Parampreet SINGH and conducted by MULTANI and Ranvir SINGH in Sacramento, CA on March 11, 2021; Target Location 4 is identified as a suspected stash location*

37.  On March 9, 2021, UC-1 contacted Parampreet SINGH and arranged for the purchase of approximately 1 kilogram of cocaine for $40,000 USD by UC-2 in Sacramento, CA. They also agreed that UC-2 would deliver an additional $5,890 USD as payment for the January 27 and February 12, 2021 cocaine deals facilitated by SINGH and MULTANI with UC-1 in Toronto, Canada.  UC-1 coordinated this deal while communicating with Parampreet SINGH via BOTIM at 209-500-0001.  Parampreet SINGH informed UC-1 that MULTANI would pick up the money and that MULTANI would handle matters.

During the phone call communication, Parampreet SINGH handed his cell phone to MULTANI, who confirmed directly with UC-1 that he (MULTANI) would be picking up the money on Thursday March 11, 2021, in Sacramento, CA.

38.  On March 10, 2021, UC-1 contacted MULTANI via WhatsApp at 732-705-0883, and told MULTANI that the money for the deal will be arriving in his area later that day. MULTANI responded by saying that it was "here" and "ready."  Investigators believe that MULTANI was referring to the location of the cocaine and that MULTANI was advising UC-1 that he was in possession of the cocaine in Sacramento, CA.

39.  On March 11, 2021, in anticipation of a drug buy with MULTANI, surveillance was established at 2393 Alta Garden Lane, Sacramento, CA, which was previously identified as an address associated to Ranvir SINGH, Parampreet SINGH and MULTANI. Surveillance members observed MULTANI's vehicle, a blue Volkswagen SUV with California plate 8SSC112 (**Target Vehicle 3**), parked in front of the condominium at 2393 Alta Garden. Subsequently, surveillance members observed MULTANI driving **Target Vehicle 3** away from the condominium until the vehicle was out of sight.  Sometime later, the geo-location data for 209-500-0001 (Parampreet SINGH) and MULTANI's cell phone (732-705-0883) revealed that both devices were in the approximate area of 847 Harbor Boulevard (**Target Location 4**), the location of the Chevron gas station owned by Parampreet SINGH. Earlier in the day, UC-1 contacted Parampreet SINGH at 209-500-0001.  Parampreet SINGH advised UC-1 that the deal was set for 1:00 pm and that Parampreet SINGH already spoke to MULTANI.  The subsequent communications between UC-1, Parampreet SINGH and MULTANI ultimately facilitated a meeting between UC-2 and MULTANI, during which UC-2 handed MULTANI $45,890 USD as payment for approximately 1 kilogram of cocaine, payments for prior cocaine deals in Canada on January 27 and February 12, 2021, that Parampreet SINGH and MULTANI had coordinated, and a broker fee meant for Parampreet SINGH.  MULTANI appeared at the initial meet location in his blue Volkswagen SUV (**Target Vehicle 3**) with a male passenger who was later identified as Ranvir SINGH.  Ranvir SINGH and MULTANI were then followed to 847 Harbor Blvd, West Sacramento, CA (**Target Location 4**), which is the Chevron gas station owned by Parampreet SINGH. Investigators observed Ranvir SINGH and MULTANI exit **Target Vehicle 3** and enter the gas station convenience store at **Target Location 4**.  Then investigators observed Ranvir SINGH and MULTANI exit the gas station (**Target Location 4**) and enter **Target Vehicle 3**. Surveillance members observed MULTANI was in possession of a green plastic bag that appeared weighed down as he entered **Target Vehicle 3**. Ranvir SINGH and MULTANI were then followed back into the area of the initial meet with UC-2.  At this time UC-1, who was coordinating the meet directly with MULTANI, told MULTANI that the meet location was changed to the Cheesecake Factory restaurant located at 1771 Arden Way. The surveillance team then lost visual of **Target Vehicle 3** for approximately 15-20 minutes as the vehicle made several quick stops and direction changes which surveillance members identified as counter-surveillance.  This tactic is used by many subjects involved in the trafficking of narcotics to attempt to increase the difficulty for law enforcement to maintain visual of a target vehicle while in transit.  During the break in visual surveillance, MULTANI's phone pinged in the vicinity of the nearby condominium at 2393 Alta

11

Garden Lane.  Soon thereafter, an unknown grey Toyota Corolla parked next to UC-2's vehicle in the parking lot of the Cheesecake Factory.  UC-2 then exited his vehicle and walked up to the passenger side window of the Toyota Corolla and identified the driver of the vehicle as Ranvir SINGH and the passenger as MULTANI.  MULTANI then handed UC-2 a green plastic bag which contained approximately 1 kilogram of suspected cocaine. Investigators administered a presumptive test on a sample of the white powdery substance that was contained in the green plastic bag which tested positive for Cocaine HCL. The green plastic bag appeared to be same as the green plastic bag that MULTANI carried as he and Ranvir SINGH left the Chevron gas station at 847 Harbor Blvd (**Target Location 4**).

### *Additional Information Regarding Target Location 2*

40.  On March 25, 2021, at approximately 10:15 a.m., investigators observed a white Toyota sedan bearing CA license plate 7NTH692 (2015 Toyota, valid, r/o Ranvir SINGH at 1710 Baines Ave., Sacramento, CA) parked in the driveway of the residence located at 1710 Baines Ave., Sacramento, CA. At the same approximate time, investigators observed a white Mercedes SUV bearing CA license plate PB711 (2016 Mercedes, valid, r/o Sarbjit SINGH at 1710 Baines Ave., Sacramento, CA) (**Target Vehicle 5**) parked on Blackrock Dr., east of the residence. 1710 Baines Ave., Sacramento, CA is located on the northwest corner of the intersection of Baines Ave. and Blackrock Dr.

### *Surveillance of MULTANI at 2209 Stansfield Drive, Roseville, California (Target Location 3)*

41.  On March 31, 2021, static surveillance was established at the intersection of Pleasant Grove Blvd and Monument Drive.  Subsequently, surveillance observed a blue Volkswagen SUV with California license plate 8SSC112, (**Target Vehicle 3**) travel westbound from that intersection.  Investigators followed the vehicle as it made a right turn on Somerton Court and lost visual.  Upon canvassing the immediate neighborhood, investigators reacquired **Target Vehicle 3,** which was parked in the driveway of 2209 Stansfield Drive, Roseville, California (**Target Location 3**).  SA Josh Matas drove past the residence as the driver of the vehicle, who he positively identified as Amandeep MULTANI, exited the driver's door of **Target Vehicle 3** while the garage door immediately in front of **Target Vehicle 3** was observed open. At the same approximate time, location data for cellular telephone 732-705-0883, used by MULTANI, showed that the cellular telephone was located within a radius that includes **Target Location 3.** Analysis of historical location data for MULTANI's cellular telephone revealed that MULTANI frequented an area within the radius that includes **Target Location 3** and that MULTANI would remain there overnight.

42.  On April 5, 2021, at approximately 7:19 am, surveillance was conducted of **Target Location 3**.  Investigators observed **Target Vehicle 3** parked in the driveway facing the garage door.  At the same time, location data for MULTANI's cellular telephone was located within a radius that includes **Target Location 3**.  At approximately 9:01 am, **Target Vehicle 3** was not observed in the driveway of the residence and the location data

for MULTANI's phone showed that the cellular telephone was located away from **Target Location 3**. Sometime later, investigators observed **Target Vehicle 3** parked in the driveway facing an opened garage door and the location data for MULTANI's phone showed that the cellular telephone was again located within the radius that includes **Target Location 3**.

## Intelligence Regarding Phone Subscriber and Thomson Reuter CLEAR Checks

43. Inquiries in March 2021 with Verizon revealed that cellular telephone number 209-500-0001, used by Parampreet SINGH, was an active phone number with Verizon as of August 21, 2017. The account is subscribed in the name of Ranvir SINGH with a listed contact name of Parampreet SINGH. The subscriber address is listed as PO Box 348090, Sacramento, California. Further database checks in March 2021, utilizing the Thomson Reuters CLEAR database, revealed that Parampreet SINGH maintains a listed address of 3001 Goshawk Street, Davis, CA 95616 (**Target Location 1**).

44. Inquiries in March 2021 with T-Mobile revealed that cellular telephone number 732-705-0883, used by MULTANI, was an active phone number with T-Mobile as of July 8, 2020. The account is subscribed in the name of Manjit Muleani. The subscriber address is listed as 7871 Mission Grove Parkway, Apt 115, Riverside, CA. Further database checks in March 2021, utilizing the Thomson Reuters CLEAR database revealed that Amandeep MULTANI maintains a listed address of 7871 Mission Grove Parkway, Apt 115, Riverside, CA.

45. Inquiries in March 2021 with Verizon revealed that cellular telephone number 253-205-6137, used by Ranvir SINGH, was an active phone number with Verizon as of December 1, 2013. The account is subscribed in the name of Ranvir SINGH. The subscriber address is listed as PO Box 348090, Sacramento, California. This phone number has the same subscriber name and address as telephone number 209-500-0001, used by Parampreet SINGH. Further database checks in March 2021, utilizing the Thomson Reuters CLEAR database revealed that Ranvir SINGH maintains a listed address of 1710 Baines Avenue, Sacramento, CA (**Target Location 2**).

### *Intelligence Regarding Toll Analysis*

46. In March 2021, investigators conducted toll analysis of Parampreet SINGH, Ranvir SINGH and Amandeep MULTANI's identified phone numbers: 209-500-0001, 253-205-6137 and 732-705-0883, respectively. Investigators have found that all three phone numbers have maintained contact from November 5, 2020 to March 17, 2021.

## *Information Regarding Businesses Associated to Parampreet SINGH, Ranvir SINGH and MULTANI*

47. Investigators searched Articles of Incorporation of a General Stock Corporation (hereinafter AOI) filed with the Secretary of State, State of California, to identify MIRI PIRI TRANSPORTATION, INC. (California corporation number C3684728). The AOI,

13

filed on June 12, 2014 that corresponds to MIRI PIRI TRANSPORTATION, INC., identified Parampreet SINGH as the Incorporator and Agent for Service of Process. The AOI lists 2701 Del Paso Rd., Suite 294, Sacramento, CA as the corporate address. A Statement of Information (hereinafter SOI) filed on October 5, 2017, lists Parampreet SINGH as the only person associated with the corporation (identified as CEO, Secretary, CFO, Director and Agent for Service of Process) and lists 4800 Kokomo Dr., Unit 3414, as an address associated with the corporation. An AOI filed on January 24, 2020, lists 4800 Kokomo Dr., Unit 3414 as the street address of the principal executive and business offices. However, the same AOI lists Ranvir SINGH, 1710 Baines Ave., Sacramento, CA as the CEO, Secretary, CFO and Agent for Service of Process. The documents identify MIRI PIRI TRANSPORTATION, INC. as a "transportation" or "transportation services" business. A SAFFER Web Company Snapshot links MIRI PIRI TRANSPORTATION, INC to physical address 2393 Alta Garden Lane, Sacramento, CA and phone number 916-900-8243.  An open source query revealed 916-900-8243 is used as the contact information for MIRI PIRI TRANSPORTATION INC. and lists 4800 Kokomo Drive, Sacramento, California as the location of the business.

48.  Investigators searched public databases and identified the business 5AAB EXPRESS LLC linked to 2393 Alta Garden Lane, Sacramento, CA. Public databases provide California Corporation Number 202032410826 for 5AAB EXPRESS LLC. A SAFER Web Company Snapshot links 5AAB EXPRESS LLC to physical address 2393 Alta Garden Lane, Sacramento, CA; telephone number 732-705-0883; USDOT number 3529978 and State Carrier ID Number MC-1174828. Investigators identified 732-705-0883 as a cellular telephone number used by Amandeep MULTANI.  An AOI for a LLC Registration with the Secretary of State, State of California, identify 5AAB EXPRESS LLC (Entity Number 202032410826). The AOI, filed on November 17, 2020, identify Manjit MULTANI as the Organizer of 5AAB EXPRESS LLC and the Agent for Service of Process. The AOI lists 2393 Alta Garden Lane, Sacramento, CA as the street and mailing address for 5AAB EXPRESS LLC.  The AOI filed on December 3, 2020, lists Manjit Singh MULTANI as the only person associated with the corporation (identified as CEO, Manager, Member and Agent for Service of Process). The AOI further identifies 5AAB EXPRESS LLC as a "transportation" business. In January 2020, Canadian investigators provided information regarding a January 2021 social media posting in which Parampreet SINGH congratulated Amandeep MULTANI for opening a trucking business.

## Training and Experience Regarding Drug Trafficking and Drug Traffickers

49.  As a result of my experience and training, I have learned that traffickers who deal in various quantities of controlled substances, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions.  Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators. These records may be kept on paper or contained in memory calculators or computers.  It is also my experience that these traffickers tend to keep these accounts and records in their residence and in the areas under their control.  It is my training and experience, that in the case of drug dealers, evidence is likely to be found where the

14

dealers live.   United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986).   It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time.   United States v. Greany, 929 F.2d 523, 525 (9th Cir. 1991).

50.  Based upon my experience and training, I have learned that drug traffickers often place their assets in names other than their own to avoid detection of those assets by law enforcement and the Internal Revenue Service (IRS); that those persons are commonly family members, friends, and associates who accept title of assets to avoid discovery and detection; that traffickers also often place assets in the ownership of corporate entities to avoid detection by law enforcement agencies and although these assets are in other individual(s) or corporate names, the traffickers continue to use these assets and exercise dominion and control over them.  Typically, drug traffickers keep records of those registrations and transactions in their residence.

51.  I have learned that large-scale drug traffickers often have on hand large amounts of United States currency in order to maintain and finance their ongoing business.  It has been my experience that drug traffickers often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles and other items of value and/or proceeds of drug transactions, including evidence of financial transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances in their residence or in the areas under their control.

52.  In my experience, traffickers commonly have in their possession, that is, on their person, at their residence and in the areas under their control, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons.  Such firearms are used by drug violators to protect their illicit drug trafficking operations, and themselves against law enforcement and other drug violators because the illicit drug trade is an inherently dangerous illegal activity involving large amounts of valuable contraband and drug proceeds.  Such property may include, but is not limited to, narcotics and other dangerous drugs, jewelry, narcotic paraphernalia, books, records, ledgers and quantities of currency.

53. In my experience, traffickers commonly have in their possession, that is on their person, at their residences, and their vehicles, and in the areas under their control and which they have free and ready access to, drugs, including but not limited to in this case, cocaine, heroin, opium, and ketamine, which they intend to distribute.  It is my experience that drug traffickers commonly utilize these areas (vehicles, residences, properties, etc.) as locations to conceal their narcotics from law enforcement.

54. In my experience, drug traffickers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product.  Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

55. In my experience, large scale traffickers often maintain in their possession and at their residence fictitious identification, including but not limited to, driver's licenses, employment cards, insurance cards, social security cards, certificates of birth and passports which are obtained by the traffickers and utilized in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activities.

56. In my experience, drug traffickers often utilize vehicles in which to transport and distribute controlled substances in facilitation of their trafficking activities. It has also been my experience that traffickers will also utilize vehicles as locations in which to store controlled substances prior to distribution. During prior investigations, I have observed that drug traffickers will often utilize vehicles registered in the names of individuals other than themselves in an effort to avoid detection by law enforcement.

57. In addition, these traffickers tend to attempt to legitimize their assets by establishing domestic and foreign businesses, by creating shell corporations, by utilizing bank haven countries and attorneys specializing in drafting and establishing such entities employed to "launder" the proceeds derived from the distribution of controlled substances.

58. In establishing these entities, the traffickers sometimes must travel to meetings in foreign countries as well as domestically. As a result of that travel, records are generated reflecting travel by commercial and private aircraft, Commercial Ocean and private vessels as well as common carrier(s).

59. Individuals involved in the distribution of cocaine, heroin, and other illegal drugs often make, or cause to be made, pictures, videos, movies, compact discs, floppy discs, or other such items which are or contain photographic or digital images in order to memorialize their narcotics distribution, use, possession, or any other activities surrounding their drug trafficking activities, and that such items often identify co-conspirators in their drug trafficking activities.

60. It has been my experience in the past, and particularly in this case, that when suspects utilize mobile telephones to communicate with cooperating individuals or undercover agents to set up drug deals, records relating to these activities will be found stored in the cellular telephone.

61. I know that narcotics traffickers use mobile telephones to communicate with one another, either by voice or text message. Mobile telephones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other narcotics traffickers and the dates and times that they and/or the mobile telephone user dialed one another's telephones. Mobile telephones also contain in their memory a telephone book. This allows the user to store telephone numbers and other contact information; the information stored in a telephone used by a narcotics trafficker is evidence of the associations of the narcotics trafficker, some of which are related to his or her illegal business. Mobile telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user. The text message history of a narcotics trafficker's mobile telephone can contain evidence of

narcotics trafficking because it shows the communications or planned communications of a narcotics trafficker and the telephone numbers of those with whom the narcotics trafficker communicated or intended to communicate.  Mobile telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer.  Narcotics traffickers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity. Mobile telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by a narcotics trafficker. Mobile telephones can also contain photographic data files, which can be evidence of criminal activity when the user was a narcotics trafficker who took pictures of evidence of crime. Mobile telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

62.  From my training and experience, I know that individuals that drug traffickers also frequently use computers and other electronic media to conduct their trade and to keep track of drug inventories, proceeds, and debts.  This information can be found in electronic records that might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

63.  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

64.  Thus, the forensic analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices. Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

65.  In cases of this sort, laptop computers and/or smartphones are also used as instrumentalities of the crime to commit offenses involving interstate drug sales and movement of drug proceeds. Devices such as modems and routers can contain information about dates, frequency, and computer(s) used to access the Internet. The laptop or smart phone may also have fingerprints on them indicating the user of the computer and its components.

66.  Similarly, files related to the purchasing and selling of controlled substances, as well as, the movement of currency found on computers and other digital communications devices are usually obtained from the Internet or the cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the identity of the person engaging in the conduct as well as the method of location

or creation of the data, search terms used, exchange, transfer, distribution, possession or origin of the files. Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary internet directory or "cache". The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed internet pages or if a user takes steps to delete them. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

67.  "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time. Your affiant knows from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of internet connection at the residence.

68.  Searching the computer(s) for the evidence described in the attachment may require a range of data analysis techniques. For example, information regarding user attribution or internet use is located in various operating system log files that are not easily located or reviewed. In addition, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names. As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this location (the computer) for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

69.  Based upon knowledge, training and experience, your affiant knows that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

a.  The nature of evidence: As noted above, not all evidence takes the form of documents and files that can be easily viewed on-site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

b.  The volume of evidence and time required for an examination: Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

c.  Technical requirements: Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off- site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d.  Variety of forms of electronic media: Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

70.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant. The examination may require techniques, including but not limited to, computer-assisted scans of the entire medium that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

71.  As described above and in Attachments A-1 through A-9, and Attachment B, this Affidavit seeks permission to search and seize things that are related to the cocaine, heroin, ketamine and opium trafficking conspiracy between Parampreet SINGH, Amandeep MULTANI and Ranvir SINGH, in whatever form such things are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Even when a user deletes information from a device, it can sometimes be recovered with forensics tools.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

72.  It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators to whom I have spoken, that the items listed in Attachment B are items most often associated with the distribution of controlled substances, including cocaine, heroin, opium, and ketamine, as well as the proceeds from such illegal operations.

73.  The facts set forth in this Affidavit are known to me as a result of my personal participation in this investigation, through conversations with other agents who have participated in this investigation, and from reviewing official reports, documents, and other evidence obtained as a result of this investigation.  This Affidavit is not an exhaustive enumeration of the facts that I have learned during the course of this investigation but, instead, are facts that I believe support a finding of probable cause to search the requested locations.

74. Based on my experience and training, and after consulting with other law enforcement officers experienced in drug investigations, I know that individuals involved in drug dealing often maintain at their residences, vehicles, and their persons the items described in Attachment B.  Individuals involved in drug dealing also often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances.  Therefore, I am requesting authority to seize all the items listed in Attachment B to this Affidavit and incorporated here by reference.

75.     **REQUEST FOR SEALING:**  I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

## Conclusion

76.  Based on the information described above and the totality of the information gathered during the investigation, there is probable cause to believe that Parampreet SINGH, Amandeep MULTANI, and Ranvir SINGH have, between at least August 25, 2020 and the present, conspired with one another and others to distribute and possess with intent to distribute cocaine, heroin, opium and ketamine from Sacramento, California and

elsewhere.  Further, there is probable cause to believe that the execution of search warrants at **Target Locations 1-4** and **Target Vehicles 1-5** would generate evidence of crimes in violation of 21 U.S.C §§ 846 and 841.

I swear under penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information and belief.


_____/s/_____
Joshua Matas
Special Agent
Drug Enforcement Administration


Sworn to and subscribed to me telephonically on April _7_, 2021. at 8:01 am


Hon. Carolyn K. Delaney
United States Magistrate Judge



Approved as to form:


___/s/David Spencer_____
David W. Spencer
Assistant United States Attorney


21

# Attachment A-1

### Search Warrant Site
### 3001 Goshawk Street, Davis, California

A.    **TARGET LOCATION 1** – The premises to be searched are located at **3001 Goshawk Street, Davis, California**.  The residence is a single family, white, two story residence with the numbers "3001" prominently displayed in black lettering on the residence south of the front door. The residence is located on the northwest corner of the intersection of Goshawk St. and Falcon Ave., Davis, CA. The front door of the residence faces Goshawk St., and the driveway and garage doors (three car attached garage) of the residence face Falcon Avenue. A photo of the premises to be searched is below.

B.    The place to be searched includes the residence, all rooms, attics, basements, and storage areas; all trash receptacles; and all surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, located on the premises.



# Attachment A-2

### Search Warrant Site
**1710 Baines Avenue, Sacramento, California**

A.      **TARGET LOCATION 2** – The premises to be searched are located at **1710 Baines Avenue, Sacramento, California**.  The residence is a standalone single family residence displaying numbers "1710" next to the garage door entrance.  The residence is located on the southwest corner of the intersection of Baines Avenue and Blackrock Drive. A photo of the premises to be searched is below.

B.      The place to be searched includes the residence, all rooms, attics, basements, and storage areas; all trash receptacles; and all surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, located on the premises.



# Attachment A-3

### Search Warrant Site
### 2209 Stansfield Drive, Roseville, California 95747

A.      **TARGET LOCATION 3** – The premises to be searched are located at **2209 Stansfield Drive, Roseville, California 95747.**  The residence is a standalone single family residence displaying numbers "2209" over the left corner of the garage entrance. The residence is located directly south of the intersection of Kersey Court and Stansfield Drive.  A photo of the residence is provided below.

B.      The place to be searched includes the residence, all rooms, attics, basements, and storage areas; all trash receptacles; and all surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, located on the premises.



# Attachment A-4

### Search Warrant Site
### 847 Harbor Boulevard, West Sacramento, California

A.  **TARGET LOCATION 4** – The premises to be searched are located at **847 Harbor Boulevard, West Sacramento, California**.  The commercial property is a Chevron Extra Mile gas station displaying numbers "847" over the front entrance in white lettering. The commercial property is located on the northeast corner of the intersection of Harbor Blvd and Evergreen Ave., West Sacramento, CA. Photographs of the premises to be searched are below.

B.  The place to be searched includes the convenience store, all rooms, attics, basements, offices, and storage areas; all trash receptacles; and all surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, located on the premises.



# **Attachment A-5**

A.      **TARGET VEHICLE 1** - 2003 HUMMER SUV, Maroon with CA license #PJB37
Registered to Parampreet SINGH at 847 Harbor Boulevard, West Sacramento, California.

B.       The search of TARGET VEHICLE 1 is to include all internal and external compartments
and all containers that may be associated with the storage of controlled substances, proceeds of
controlled substances sales, digital media, or their instrumentalities.  A photo of the vehicle is
below.



# **Attachment A-6**

A.     **TARGET VEHICLE 2** - 2019 AUDI sedan, Blue with CA license #SLOWA5 registered to Parampreet SINGH at 847 Harbor Boulevard, West Sacramento, California. The search of TARGET VEHICLE 2 is to include all internal and external compartments and all containers that may be associated with the storage of controlled substances, proceeds of controlled substances sales, digital media, or their instrumentalities.  A photo of the vehicle is below.



# **Attachment A-7**

A.  **TARGET VEHICLE 3** - 2015 Volkswagen SUV, Blue with CA license #8SSC112
Registered to Manit MULTANI at 7871 Mission Grove Parkway S, Apt 115, Riverside,
California.
B.  The search of the TARGET VEHICLE 3 is to include all internal and external
compartments and all containers that may be associated with the storage of controlled
substances, proceeds of controlled substances sales, digital media, or their instrumentalities.  A
photo of the vehicle is below.



# **Attachement A-8**

A.      **TARGET VEHICLE 4** - 2015 Toyota sedan, White with CA license #7NTH692 registered to Ranvir SINGH at 1710 Baines Avenue, Sacramento, California.  The search of TARGET VEHICLE 4 is to include all internal and external compartments and all containers that may be associated with the storage of firearms or firearms parts, proceeds of firearms sales, digital media, or their instrumentalities.  A photo of the vehicle is below.

B.      The search of the TARGET VEHICLE 4 is to include all internal and external compartments and all containers that may be associated with the storage of controlled substances, proceeds of controlled substances sales, digital media, or their instrumentalities.  A photo of the vehicle is below



## **Attachment A-9**

A.       **TARGET VEHICLE 5** - 2016 Mercedes SUV, White with CA license #PB711 registered to Sarbjit SINGH at 1710 Baines Avenue, Sacramento, California.  The search of TARGET VEHICLE 5 is to include all internal and external compartments and all containers that may be associated with the storage of firearms or firearms parts, proceeds of firearms sales, digital media, or their instrumentalities.  A photo of the vehicle is below.

B.       The search of the TARGET VEHICLE 5 is to include all internal and external compartments and all containers that may be associated with the storage of controlled substances, proceeds of controlled substances sales, digital media, or their instrumentalities.



# Attachment B
## Items to be seized

Law enforcement is authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"):

- 21 U.S.C. §§ 841(a)(1) and 846 – Conspiracy to distribute and possess with intent to distribute cocaine, opium, heroin and ketamine.
- 21 U.S.C. § 841(a)(1) – Distribution and possession with intent to distribute cocaine, opium, heroin and ketamine.

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1.  Controlled substances, including  heroin, opium, cocaine, and ketamine, or items used to distribute controlled substances; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and containers; and plastic surgical gloves;

2.  United States and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking, including the pre-recorded U.S. currency used to purchase cocaine, opium, heroin and ketamine during this investigation;

3.  Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

4.  Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which could be used to participate in a conspiracy to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1);

5.  Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

6.  Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

7.  Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including traveler's checks, bonds, stock certificates, cashier's checks and

certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8.  Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances;

9.  Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10.  Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the distribution or possession of, with the intent to distribute controlled substances or discovered in the possession of a prohibited person; and

11.  Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records.

12.  Any digital devices or other electronic storage media and/or their components used as a means to commit the violations described above, including:

    a.  any digital device or other electronic storage media capable of being used to commit, further, or store evidence or fruits of the Target Offenses;

    b.  any digital devices or other electronic storage media used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, cameras, printers, plotters, encryption devices, and optical scanners;

    c.  any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

    d.  any documentation, operating logs and reference manuals regarding the operation of the digital device or other electronic storage media or software;

    e.  any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

    f.  any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

g.  any passwords, password files, seed words, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

13.  For any digital device or other electronic storage media upon which electronically stored information that is called for by this warrant may be contained, or that may contain things otherwise called for by this warrant:

a.  Any and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data in the memory of the digital device or other electronic storage media or on a server and associated with the digital device or electronic storage media, including:

i. Incoming call history;
ii. Outgoing call history;
iii. Missed call history;
iv. Outgoing text messages;
v. Incoming text messages;
vi. Draft text messages;
vii. Telephone book;
viii. Emails;
ix. Data screen or file identifying the telephone number associated with the mobile telephone searched;
x. Data screen, file, or writing containing serial numbers or other information to identify the electronic device searched;
xi. Voicemail;
xii. User-entered messages (such as to-do lists); and
xiii. Stored media such as photographs or video.

b.  Any and all locations, addresses, GPS coordinates, names, time/date information, or other electronic data related to addresses and driving directions.

c.  All information and records related to violations of 21 U.S.C. § 841(a) (drug trafficking) and/or 21 U.S.C. § 846 (conspiracy to traffic drugs), including but not limited to:

i. Data and information related to stored applications and/or websites used to communicate with associates and co-conspirators;

ii. Data, information, or documents related to the manufacture of controlled substances, including the acquisition, possession, and use of equipment, paraphernalia, chemicals, and materials used in the manufacturing process;

iii. lists of customers and related identifying information;

iv. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

v. any information related to sources of drugs or drug manufacturing materials and equipment (including names, addresses, phone numbers, email addresses, or any other identifying information);

vi. any information recording schedule or travel;

vii. all bank records, checks, credit card bills, account information, and other financial records;

viii. data, information, or documents related to the receipt of proceeds from controlled substances distribution and the transfer, investment, control, and disposition of those proceeds;

ix. records of Internet Protocol addresses used;

x. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

xi. any communications related to drug trafficking;

xii. Stored media such as photographs or video.

d.  evidence of who used, owned, or controlled the digital device or other electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

e.  evidence of software that would allow others to control the digital device or other electronic storage media, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

f.  evidence of the lack of such malicious software;

g.  evidence of the attachment to the digital device of other storage devices or similar containers for electronic evidence;

h.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the digital device or other electronic storage media;

i.  evidence of the times the digital device or other electronic storage media was used;

j.  passwords, encryption keys, seed words, and other access devices that may be necessary to access the digital device or other electronic storage media;

k.  documentation and manuals that may be necessary to access the digital device or other electronic storage media or to conduct a forensic examination of the digital device or other electronic storage media;

l.  Contextual information necessary to understand the evidence described in this attachment.

14.  Records and things evidencing the use of an Internet Protocol (IP) address to communicate with the internet, including:

a.  routers, modems, and network equipment used to connect computers to the internet;

b.  records of Internet Protocol addresses used;

c.  Records of internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

THE SEIZURE OF DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE MEDIA AND/OR THEIR COMPONENTS AS SET FORTH HEREIN IS SPECIFICALLY AUTHORIZED BY THIS SEARCH WARRANT, NOT ONLY TO THE EXTENT THAT SUCH DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE MEDIA CONSTITUTE INSTRUMENTALITIES OF THE CRIMINAL ACTIVITY DESCRIBED ABOVE, BUT ALSO FOR THE PURPOSE OF CONDUCTING OFF-SITE EXAMINATIONS OF THEIR CONTENTS FOR EVIDENCE, INSTRUMENTALITIES, OR FRUITS OF THE AFOREMENTIONED CRIME.