PHILLIP A. TALBERT
United States Attorney
DAVID W. SPENCER
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>AMANDEEP MULTANI,<br><br>Defendant. | CASE NO. 2:21-CR-0078-JAM<br><br>PLEA AGREEMENT<br><br>DATE:<br>TIME: 9:30 a.m.<br>COURT: Hon. John A. Mendez |

## I.   INTRODUCTION

### A.   Scope of Agreement

The Indictment in this case charges the defendant with a violations of 21 U.S.C. §§ 846 and 841(a)(1) – conspiracy to distribute and to possess with intent to distribute cocaine, heroin, opium, and ketamine ("Count One") and 21 U.S.C. § 841(a)(1) – distribution of cocaine ("Count Two"). This document contains the complete plea agreement between the United States Attorney's Office for the Eastern District of California (the "government") and the defendant regarding this case. This plea agreement is limited to the United States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

### B.   Court Not a Party

The Court is not a party to this plea agreement. Sentencing is a matter solely within the discretion of the Court, and the Court may take into consideration any and all facts and circumstances

PLEA AGREEMENT                                    1

concerning the criminal activities of defendant, including activities that may not have been charged in the Indictment. The Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to and including the statutory maximum stated in this plea agreement.

If the Court should impose any sentence up to the maximum established by the statute, the defendant cannot, for that reason alone, withdraw his guilty plea, and he will remain bound to fulfill all of the obligations under this plea agreement. The defendant understands that neither the prosecutor, defense counsel, nor the Court can make a binding prediction or promise regarding the sentence he will receive.

## II.    DEFENDANT'S OBLIGATIONS

### A.    Guilty Plea

The defendant will plead guilty to Count One, charging him with conspiracy to distribute and to possess with intent to distribute cocaine, heroin, opium, and ketamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1). The defendant agrees that he is in fact guilty of this charge and that the facts set forth in the Factual Basis For Plea attached hereto as Exhibit A are accurate.

The defendant agrees that this plea agreement will be filed with the Court and become a part of the record of the case. The defendant understands and agrees that he will not be allowed to withdraw his plea should the Court not follow the government's sentencing recommendations.

The defendant agrees that the statements made by him in signing this Agreement, including the factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a guilty plea pursuant to this Agreement. The defendant waives any rights under Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence, to the extent that these rules are inconsistent with this paragraph or with this Agreement generally.

The defendant acknowledges that the crime to which he is pleading guilty is listed in 18 U.S.C. § 3143(a)(2), and agrees that he will remain in custody upon the entry of his plea.

B. **Special Assessment**

The defendant agrees to pay a special assessment of $100 at the time of sentencing by delivering a check or money order payable to the United States District Court to the United States Probation Office immediately before the sentencing hearing. The defendant understands that this plea agreement is voidable at the option of the government if he fails to pay the assessment prior to that hearing. If the defendant is unable to pay the special assessment at the time of sentencing, he agrees to earn the money to pay the assessment, if necessary by participating in the Inmate Financial Responsibility Program.

C. **Agreement to Cooperate**

The defendant agrees to cooperate fully with the government and any other federal, state, or local law enforcement agency, as directed by the government. As used in this plea agreement, "cooperation" requires the defendant: (1) to respond truthfully and completely to all questions, whether in interviews, in correspondence, telephone conversations, before a grand jury, or at any trial or other court proceeding; (2) to attend all meetings, grand jury sessions, trials, and other proceedings at which the defendant's presence is requested by the government or compelled by subpoena or court order; (3) to produce voluntarily any and all documents, records, or other tangible evidence requested by the government; (4) not to participate in any criminal activity while cooperating with the government; and (5) to disclose to the government the existence and status of all money, property, or assets, of any kind, derived from or acquired as a result of, or used to facilitate the commission of, the defendant's illegal activities or the illegal activities of any conspirators.

D. **Defendant's Violation of Plea Agreement or Withdrawal of Plea**

If the defendant violates this plea agreement in any way, withdraws his plea, or tries to withdraw his plea, this plea agreement is voidable at the option of the government. The government will no longer be bound by its representations to the defendant concerning the limits on criminal prosecution and sentencing as set forth herein. One way a defendant violates the plea agreement is to commit any crime or provide any statement or testimony which proves to be knowingly false, misleading, or materially incomplete. Any post-plea conduct by a defendant constituting obstruction of justice will also be a violation of the agreement. The determination whether the defendant has violated the plea agreement shall be decided under a probable cause standard.

If the defendant violates the plea agreement, withdraws his plea, or tries to withdraw his plea, the government shall have the right: (1) to prosecute the defendant on any of the counts to which he pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this plea agreement; and (3) to file any new charges that would otherwise be barred by this plea agreement. The defendant shall thereafter be subject to prosecution for any federal criminal violation of which the government has knowledge, including perjury, false statements, and obstruction of justice. The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office.

By signing this plea agreement, the defendant agrees to waive any objections, motions, and defenses that the defendant might have to the government's decision to exercise the options stated in the previous paragraph. Any prosecutions that are not time-barred by the applicable statute of limitations as of the date of this plea agreement may be commenced in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement of any such prosecutions. The defendant agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-barred as of the date of this plea agreement.

In addition: (1) all statements made by the defendant to the government or other designated law enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal, whether before or after this plea agreement, shall be admissible in evidence in any criminal, civil, or administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by the defendant before or after this plea agreement, or any leads derived therefrom, should be suppressed. By signing this plea agreement, the defendant waives any and all rights in the foregoing respects.

### III.  THE GOVERNMENT'S OBLIGATIONS

#### A. Dismissals

The government agrees to move, at the time of sentencing, to dismiss without prejudice the remaining count in the pending Indictment. The government also agrees not to reinstate any dismissed

count except if this agreement is voided as set forth herein, or as provided in II.D (Defendant's Violation of Plea Agreement), VI.B (Guidelines Calculations), and VII.B (Waiver of Appeal) herein.

### B. Recommendations

#### 1. Incarceration Range

The government will recommend that the defendant be sentenced to the low end of the applicable guideline range for his offense, including the application of the mandatory statutory minimum term, as determined by the Court. The government may recommend whatever it deems appropriate as to all other aspects of sentencing.

#### 2. Acceptance of responsibility

The government will recommend a two-level reduction (if the offense level is less than 16) or a three-level reduction (if the offense level reaches 16) in the computation of defendant's offense level if he clearly demonstrates acceptance of responsibility for his conduct as defined in U.S.S.G. § 3E1.1. This includes the defendant meeting with and assisting the probation officer in the preparation of the pre-sentence report, being truthful and candid with the probation officer, and not otherwise engaging in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either in the preparation of the pre-sentence report or during the sentencing proceeding.

#### 3. Reduction of Sentence for Cooperation

The government agrees to recommend at the time of sentencing that the defendant's sentence of imprisonment be reduced by up to 50% of the applicable guideline sentence if he provides substantial assistance to the government, pursuant to U.S.S.G. § 5K1.1. The defendant understands that he must comply with paragraph II.C (Agreement to Cooperate) and not violate this plea agreement, as set forth in paragraph II.D (Defendant's Violation of Plea Agreement) herein. The defendant understands that it is within the sole and exclusive discretion of the government to determine whether the defendant has provided substantial assistance.

The defendant understands that the government may recommend a reduction in his sentence of less than 50% or no reduction at all, depending upon the level of assistance the government determines that the defendant has provided. If the government's recommended reduction pursuant to § 5K1.1 is for

a sentence below the statutory mandatory minimum, the government will also move the Court for a reduction below that minimum term, pursuant to 18 U.S.C. § 3553(e).

The defendant further understands that a motion pursuant to U.S.S.G. § 5K1.1 is only a recommendation and is not binding on the Court, that this plea agreement confers no right upon the defendant to require that the government make a § 5K1.1 motion, and that this plea agreement confers no remedy upon the defendant in the event that the government declines to make a § 5K1.1 motion. In particular, the defendant agrees not to try to file a motion to withdraw his guilty plea based on the fact that the government decides not to recommend a sentence reduction or recommends a sentence reduction less than the defendant thinks is appropriate.

If the government determines that the defendant has provided further cooperation within one year following his sentencing, the government may move for a further reduction of his sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure.

### C. Use of Information for Sentencing

The government is free to provide full and accurate information to the Court and the United States Probation Office ("Probation"), including answering any inquiries made by the Court and/or Probation, and rebutting any inaccurate statements or arguments by the defendant, his attorney, Probation, or the Court. The defendant also understands and agrees that nothing in this Plea Agreement bars the government from defending on appeal or collateral review any sentence that the Court may impose.

### IV. ELEMENTS OF THE OFFENSE

At a trial, the government would have to prove beyond a reasonable doubt the following elements of the offense to which the defendant is pleading guilty, conspiracy to distribute and to possess with intent to distribute at least five kilograms of a mixture and substance containing cocaine, at least one kilogram of a mixture and substance containing heroin, opium, and ketamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1):

1. Beginning on a date unknown, but not later than August 25, 2020, and continuing through April 8, 2021, there was an agreement between two or more persons to distribute and possess with intent to distribute at least five kilograms of a mixture and substance

containing cocaine, at least one kilogram of a mixture and substance containing heroin, opium, and ketamine; and

2. The defendant joined in the agreement knowing of its purpose and intending to help accomplish that purpose.

The defendant fully understands the nature and elements of the crime charged in the Indictment to which he is pleading guilty, together with the possible defenses thereto, and has discussed them with his attorney.

## V. MAXIMUM SENTENCE

### A. Maximum penalty

The maximum sentence that the Court can impose is life in prison, a fine of $10,000,000, a term of supervised release of at least five years and up to life, and a special assessment of $100. The charge to which defendant is pleading guilty carries a ten-year mandatory minimum sentence, absent a motion by the government for reduction pursuant to 18 U.S.C. § 3553(e). In addition, the defendant may be ineligible for certain federal and/or state assistance and/or benefits, pursuant to 21 U.S.C. § 862.

### B. Violations of Supervised Release

The defendant understands that if he violates a condition of supervised release at any time during the term of supervised release, the Court may revoke the term of supervised release and require the defendant to serve up to five years of additional imprisonment.

## VI. SENTENCING DETERMINATION

### A. Statutory Authority

The defendant understands that the Court must consult the Federal Sentencing Guidelines and must take them into account when determining a final sentence. The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines and must take them into account when determining a final sentence. The defendant further understands that the Court will consider whether there is a basis for departure from the guideline sentencing range (either above or below the guideline sentencing range) because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. The defendant further

PLEA AGREEMENT 7

understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

### B. Guideline Calculations

The government and the defendant agree that there is no material dispute as to the following sentencing guidelines variables and therefore stipulate to the following:

| | | |
|---|---|---|
| Base Offense Level: | +30 | (§2D1.1(c)(5)) |
| Role in the Offense Adjustment: | +3 | (§3B1.1(b)) |
| Acceptance of Responsibility: | -3 | (see III.A.2, above) |
| **Total Offense Level:** | **30** | |

The parties' present best estimate is that defendant's Criminal History Category is I. This estimate shall not be binding on the Court, the Probation Office, or the parties. If defendant's Criminal History Category is found to be I, the applicable guidelines range will be 30/I = 120-121 months.

The parties agree that they will not seek or argue in support of any other specific offense characteristics, Chapter Three adjustments (other than the decrease for "Acceptance of Responsibility"), or cross-references, except that the government may move for a departure or adjustment based on defendant's post-plea obstruction of justice (§3C1.1). Both parties agree not to move for, or argue in support of, any departure from the Sentencing Guidelines.

The defendant also agrees that the application of the United States Sentencing Guidelines to his case results in a reasonable sentence, and that the defendant will not request that the Court apply the sentencing factors under 18 U.S.C. § 3553 to arrive at a different sentence than that called for under the Sentencing Guidelines' advisory guideline range as determined by the Court. The defendant acknowledges that if the defendant requests or suggests in any manner a different sentence than what is called for under the advisory guideline range as determined by the Court, the plea agreement is voidable at the option of the government. The government, in its sole discretion, may withdraw from the plea agreement and continue with its prosecution of the defendant as if the parties had never entered into this plea agreement.

## VII. WAIVERS

### A. Waiver of Constitutional Rights

The defendant understands that by pleading guilty he is waiving the following constitutional rights: (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, constitutional challenges to the statutes of conviction, and other pretrial motions that have been filed or could be filed; (e) to subpoena witnesses to testify on his behalf; (f) to confront and cross-examine witnesses against him; and (g) not to be compelled to incriminate himself.

### B. Waiver of Appeal and Collateral Attack

The defendant understands that the law gives the defendant a right to appeal his guilty plea, conviction, and sentence. The defendant agrees as part of his plea, however, to give up the right to appeal any aspect of the guilty plea, conviction, and the sentence imposed in this case. The defendant understands that this waiver includes, but is not limited to, any and all constitutional and/or legal challenges to the defendant's conviction and guilty plea, including arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts attached to this agreement is insufficient to support the defendant's plea of guilty.

Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the statutory maximum; and/or (2) the government appeals the sentence in the case. The defendant understands that these two circumstances occur infrequently and that in all other cases this Agreement constitutes a complete waiver of all appellate rights.

In addition, regardless of the sentence the defendant receives, the defendant also gives up any right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any aspect of the guilty plea, conviction, or sentence imposed in this case.

Notwithstanding the agreement in paragraph III.A (Dismissals) above that the government will move to dismiss counts against the defendant, if the defendant ever attempts to vacate his plea, dismiss the underlying charges, or modify or set aside his sentence on any of the counts to which he is pleading

guilty, the government shall have the rights set forth in paragraph II.D (Defendant's Violation of Plea Agreement) herein.

### C. Impact of Plea on Defendant's Immigration Status

Defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which the defendant is pleading guilty. The defendant and his counsel have discussed the fact that the charge to which the defendant is pleading guilty is an aggravated felony, or a crime that is likely to be determined to be an aggravated felony under 8 U.S.C. § 1101(a)(43), and that while there may be arguments that defendant can raise in immigration proceedings to avoid or delay removal, it is virtually certain that defendant will be removed. Indeed, because defendant is pleading guilty to conspiracy to distribute and to possess with intent to distribute cocaine, heroin, opium, and ketamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1), removal is presumptively mandatory. Removal and other immigration consequences are the subject of a separate proceeding, however, and defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is his automatic removal from the United States.

### VIII. ENTIRE PLEA AGREEMENT

Other than this plea agreement, no agreement, understanding, promise, or condition between the government and the defendant exists, nor will such agreement, understanding, promise, or condition exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and counsel for the United States.

### IX. APPROVALS AND SIGNATURES

#### A. Defense Counsel

I have read this plea agreement and have discussed it fully with my client. The plea agreement accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to plead guilty as set forth in this plea agreement.

Dated: _____   /s/ 12/13/22
                                    N. ALLEN SAWYER
                                    Counsel for Defendant

B.  **Defendant**

I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to me, other than those contained in this plea agreement. In addition, no one has threatened or forced me in any way to enter into this plea agreement. Finally, I am satisfied with the representation of my attorney in this case.

Dated: 12/13/2022   /s/
                    AMANDEEP MULTANI, Defendant

C.  **Court Certified Interpreter/Translator**

I declare that I am a court-certified Punjabi-English interpreter/translator. On _____, I read the entire contents of the foregoing plea agreement to AMANDEEP MULTANI, translating the document from English to Punjabi.

Dated: _____   _____
                                    Interpreter/Translator

D.  **Attorney for the United States**

I accept and agree to this plea agreement on behalf of the government.

Dated: 12/13/22   PHILLIP A. TALBERT
                  United States Attorney

                  By: /s/
                  DAVID W. SPENCER
                  Assistant United States Attorney

PLEA AGREEMENT                          11

EXHIBIT "A"
**Factual Basis for Plea**

If this matter proceeded to trial, the United States would establish the following facts beyond a reasonable doubt:

Defendant Amandeep MULTANI admits that, beginning no later than August 25, 2020, and continuing through April 8, 2021, there was an agreement between MULTANI's charged co-conspirators, Parampreet SINGH and Ranvir SINGH, and others, to distribute and possess with intent to distribute: (a) at least 5 kilograms of a mixture and substance containing cocaine, (b) at least one kilogram of a mixture and substance containing heroin, (c) opium, and (d) ketamine. MULTANI joined in this agreement knowing of its purpose and intending to help accomplish that purpose.

As part of this agreement, MULTANI and his co-conspirators coordinated multiple cocaine, heroin, opium, and ketamine deals in Canada. MULTANI and co-defendants Parampreet SINGH and Ranvir SINGH coordinated these deals from California over encrypted cell phone applications (WhatsApp and BOTIM). In total, between October 2020 and April 2021, they coordinated sales to undercover officers of approximately 10 kilograms ("KG") of cocaine, 1.5 KG of opium, 2 KG of ketamine, and multiple samples of heroin, for a total of $637,600 in Canadian dollars ("CAD") and $75,190 in U.S. dollars ("USD"), in nine deals in the area of Toronto, Canada, three deals in the area of Vancouver, Canada, and one deal in Sacramento, California. (The co-defendants did not receive $265,000 CAD of these negotiated sale prices because law enforcement seized 5 KG of cocaine on April 7, 2021 before the agreed-upon deal could occur, as detailed below.) In addition, MULTANI and his co-defendants offered to sell up to 100 KG of cocaine, up to 25 KG of heroin, up to 100 KG of opium, and up to 200 KG of ketamine on numerous occasions between September 2020 and April 2021.

Specifically, MULTANI and his co-conspirators committed the following acts:

### *A Canadian Undercover Officer (UC-1) Is Introduced to Parampreet SINGH and SINGH Offers up to 50 KG of Cocaine, 25 KG of Heroin, and 30 KG of Opium*

On June 2, 2020, a Canadian undercover officer ("UC-1") met Parshotem Malhi in Brampton, Canada (a suburb of Toronto) to obtain a sample of heroin. Malhi also quoted a price of $60,000 CAD per KG of cocaine. Malhi told UC-1 that Parampreet SINGH was his drug link in California and that they had worked together in the past smuggling loads of drugs across the U.S.-Canada border in trucks that also contained legitimate cargo. Malhi advised that Parampreet SINGH and his associates had cocaine ready for purchase and pick-up in the United States.

On August 23, 2020, Malhi told UC-1 that Parampreet SINGH had authorized Malhi to give his number to UC-1. A couple days later, Parampreet SINGH made contact with UC-1 over WhatsApp. They discussed UC-1's buyers being interested in a purchase, and Parampreet SINGH said he would call UC-1 back later about the "stuff" UC-1 wanted purchase. On September 20, 2020, Parampreet SINGH advised UC-1 that he had about 25-30 KG of opium arriving in Vancouver soon and they discussed potential prices. In multiple calls in early October 2020, UC-1 and Parampreet SINGH discussed Parampreet SINGH supplying up to 50 KG of cocaine. Parampreet SINGH also said that he had 25 KG of heroin for sale. During these early calls, Parampreet SINGH instructed UC-1 to contact him using encrypted applications BOTIM and WhatsApp, admonished UC-1 not to talk openly on the phone (when UC-1 used the word "chittah" to refer to cocaine), and told UC-1 on multiple occasions that he should

not be transporting loads or touching the product himself but should be making money through phone calls.

### *Parampreet SINGH and Ranvir SINGH Coordinate 1 KG Sales of Ketamine in October and November 2020 While Offering 100-200 KG of Ketamine*

In mid-October, Parampreet SINGH informed UC-1 he had a seller in Toronto with 200 KG of ketamine and said he needed to get rid of at least 100 KG. They agreed to start with a 1 KG sample buy. Parampreet SINGH then introduced Ranvir SINGH to UC-1 to coordinate the details of the transaction, in a phone call over the BOTIM application.

On October 21, 2020, UC-1 purchased about 1 KG of ketamine in Brampton, Canada, for $23,000 USD and $8,100 CAD, in a deal arranged by Parampreet SINGH and Ranvir SINGH. Lab testing confirmed the substance was ketamine.

After the deal, Parampreet SINGH told UC-1 that UC-1 needed to purchase another 4 KG soon to show UC-1 was a serious buyer. On November 13, 2020, UC-1 purchased another 1 KG of ketamine in Brampton, Canada, for $33,000 CAD, in another deal arranged by Parampreet SINGH and Ranvir SINGH in communications over encrypted applications. Lab testing confirmed the substance was ketamine.

### *Parampreet SINGH Introduces MULTANI to UC-1 on December 3, 2020, and MULTANI Coordinates Deals for 1 KG of Purported Ketamine on December 3 and December 9*

On December 3, 2020, Parampreet SINGH told UC-1 "his guy" would call UC-1 to arrange the details of another 1 KG ketamine deal. A couple minutes later, MULTANI called UC-1 via WhatsApp. Over multiple WhatsApp calls that day, MULTANI coordinated the drug deal for that evening in Brampton, Canada. MULTANI refused to give UC-1 the phone number of his driver, saying he (MULTANI) would be the one in contact with UC-1 at all times. MULTANI said he was arranging the deal in this way because it was the first meeting and he wanted to do everything safely. MULTANI said he was very close to Parampreet SINGH and "his heartbeat is mine." MULTANI told UC-1 the driver who would meet UC-1 must say the code word "Khalistan" upon meeting. MULTANI then gave UC-1 the description of a vehicle in the parking lot, UC-1 approached the driver, Lakhpreet Brar, and Brar said the code word "Khalistan." Brar then took $33,000 CAD from UC-1 and returned a little while later with about 1 KG of purported ketamine. Lab testing revealed the purported ketamine in fact contained *Diphenhydramine*, a non-controlled substance that is an active ingredient in Benadryl.

MULTANI then arranged another 1 KG ketamine deal with UC-1 for December 9, 2020, in Brampton, Canada. Leading up to the deal, MULTANI told UC-1 he knew from Parampreet SINGH that UC-1 was looking for cocaine and that he would get UC-1 good pricing for both cocaine and heroin. Also during the lead up to the deal, Parampreet SINGH told UC-1 that MULTANI was the guy who connects people from India, Afghanistan, Germany, the United States and Canada and UC-1 should keep him happy. Parampreet SINGH also said he had 100 KG of opium available and anything UC-1 needed.

On December 9, 2020, at MULTANI's direction, UC-1 met MULTANI's driver, again Lakhreet Brar, and purchased 1 KG of purported ketamine from him for $33,000 CAD. Brar also provided a sample of heroin, as MULTANI had said he would. Lab testing revealed the purported ketamine in fact contained *Diphenhydramine* and confirmed the heroin sample to be heroin. During the deal, Brar gave UC-1 his phone number. Afterwards, MULTANI called UC-1 via WhatsApp and said he had sworn at

PLEA AGREEMENT                                        A-2

Brar for providing his phone number. MULTANI said he was in charge of setting everything up and had a lot of responsibility. He said he could not have anything happen that was unsafe and that if his driver's number got out, it would ruin his system.

### MULTANI Gives UC-1 Pricing for KGs of Heroin in Toronto and Vancouver and Discusses shipping Cocaine Into Canada from the United States Using Teams of Drivers

On December 18, MULTANI told UC-1 heroin was available and UC-1 asked for prices. MULTANI quoted $50,000 - $55,000 CAD per KG of medium quality heroin (same as the sample he provided to UC-1) and $65,000-$70,000 CAD per KG of high-quality heroin. In a subsequent call, MULTANI said the price was $55,000 for medium quality heroin. In another call in December 21, MULTANI told UC-1 he'd try to get that price down to $47,000 per KG. MULTANI said he had explained to Parampreet SINGH that they were forging a long-term relationship between the heroin seller and UC-1's buyer, brokered by UC-1, MULTANI and Parampreet SINGH. During this call, MULTANI also discussed shipping cocaine to Canada using his drivers and MULTANI said he had teams of drivers in both Texas and the Los Angeles area. MULTANI promised to get back to UC-1 with cocaine pricing, saying he needed to speak with the drivers as there was fluctuation in the drivers' system and the drivers' fees were built into the price.

In another call on December 22, 2020, MULTANI discussed heroin prices at length again. He said he had negotiated the medium quality price down to $48,000 per KG but that there was a shortage of high-quality heroin and he was coordinating with suppliers (which UC-1 understood be either in Pakistan or Afghanistan) to obtain more. In a subsequent call that day, MULTANI said he had "pure form" heroin available in Vancouver, even better than the high quality previously discussed, for an estimated $75,000 to $77,000 CAD per KG. In a call the next day, December 23, Parampreet SINGH told UC-1 that he had arranged for 100 to 200 KG of cocaine to be delivered to Canada from California.

### MULTANI Coordinates Deals for 1.5 KG of Opium on January 7, 2021

On December 25, 2020, MULTANI told UC-1 he also had opium available for $22,000 CAD per KG. He said there were 80-100 KG available and that "we can rule the market" for opium.

On January 7, 2021, UC-1 contacted MULTANI about obtaining opium, as well as heroin, cocaine, and ketamine. After multiple calls and texts via WhatsApp, MULTANI agreed to $21,000 for 1 KG of opium. Later, MULTANI advised the packages were split into 300 grams each and said he would send three (900 grams total). UC-1 said that in light of this, he would pay $20,000 and they would do price adjusting after. During these discussions, MULTANI sent UC-1 a video of someone opening packages of opium. The packages in the video matched those that were delivered later that night. MULTANI coordinated the details of the meeting with UC-1 and advised that the same driver from the December 3 and 9 ketamine deals (Lakhpreet Brar) would deliver the opium. As MULTANI stated, Brar arrived and met with UC-1 in Brampton, Canada, and sold UC-1 900 grams of opium for $20,000. Lab testing confirmed the substance was opium.

Minutes after the purchase of the 900 grams of opium, UC-1 called MULTANI and requested an additional half KG. MULTANI said he could make it available and it would be 600 grams. They agreed on a price of $11,500. The same driver (Lakhpreet Brar) returned about 20 minutes after the call and sold UC-1 two 300-gram packages (600 grams total) of opium for $11,500. The packages appeared the same as the previous packages and those in the video from MULTANI.

On January 20, 2021, UC-1 informed MULTANI that UC-1 had distributed the 300 gram opium pieces as "samples" and he told his buyers not to order more until they were ready for at least 10 KG. MULTANI responded that opium is very common now in Canada and that he had lowered the pricing to $20,000 per KG. In another call three days later, MULTANI reiterated this and discussed different types and qualities of opium.

### *MULTANI Coordinates 1 KG Sample Cocaine Deal on January 27, 2021 and Offers 25 KG of Cocaine Shortly After the Deal*

On January 7, 2021, MULTANI told UC-1 he could sell cocaine for $60,000 CAD per KG in Toronto and/or Vancouver. On January 20, 2021, MULTANI told UC-1 that he would charge a minimum of $60,000 CAD per KG of cocaine and that he had spoken with Parampreet SINGH, who had approved of this pricing. MULTANI said he was going to meet with an associate (in California) who was receiving a load in the next couple days and then would send "one or two" KGs with his driver to the Toronto area for UC-1 as a sample. On January 23, 2021, MULTANI said he would send the cocaine exactly as he received it and would prove it was coming from the United States, and even Mexico. He said the package would take a few days to reach UC-1. Later that day, MULTANI said he would arrange to have the cocaine delivered to his "office" in Etobicoke (a suburb of Toronto). They also agreed to safety mechanisms for the deal: MULTANI would send UC-1 a photo of the stamp on the cocaine. UC-1 would send the money in a package with a barcode, and MULTANI would have to send UC-1 a photo with the barcode upon receipt of the money.

On January 26, 2021, MULTANI sent UC-1 a photo of a brick of cocaine stamped "#10" as well as a color reaction test that showed a very high purity. (This photo of the cocaine matched the cocaine that was delivered the next day.) They then discussed details for the deal the next day. MULTANI also told UC-1 that Parampreet SINGH was involved in this as well and they would be working long term. He told UC-1 to check the product and tell Parampreet SINGH if it was not good.

On January 27, 2021, UC-1 spoke with both MULTANI and Parampreet SINGH in separate calls over encrypted apps. Both confirmed the deal was happening later that day. MULTANI arranged the details with UC-1; Parampreet SINGH assured UC-1 he could and should trust MULTANI, despite MULTANI's insisting that the money be provided upfront, before the cocaine arrived.

Later on January 27, 2021, in a meeting in Brampton, Canada coordinated by MULTANI, UC-1 met with MULTANI's co-conspirator Sukhvir Singh and UC-1 provided Singh $60,000 CAD for the cocaine. Singh was the passenger in a vehicle driven by Simranjeet Narang, who was also the driver to the 900 gram opium sale on January 7, 2021. About 30 minutes later, while MULTANI remained in contact with UC-1, Narang and the passenger returned and delivered 1 KG of cocaine to UC-1. Lab testing confirmed the substance was cocaine with 73% purity.

The next day, on January 28, 2021, Parampreet SINGH asked UC-1 for a report on the deal and how much UC-1 had sold the cocaine for. UC-1 said $70,000 CAD, and that they each made $5,000 CAD. Parampreet SINGH vouched for MULTANI and said that if UC-1 continued, MULTANI would provide more work (cocaine), up to 30 kilograms.

On January 29, 2021, MULTANI told UC-1 the cocaine in Toronto was still available, that the supplier had 25 KG and was stocking up a little at a time. MULTANI confirmed that he could fill an order of 25 KG for UC-1. In another call later that day, they discussed the quality of the cocaine and whether any higher quality cocaine could be obtained. In a third call that day, MULTANI described

packaging for the cocaine he sent that matched what UC-1 received. MULTANI said the bricks were packaged 5 at a time (i.e., 5 KGs at a time) when he sent it to Canada.

### *Parampreet SINGH and MULTANI Meet UC-2 in Sacramento on February 3, 2021 and UC-2 Pays $6,300 in Broker's Fees for Deals MULTANI Brokered in Canada*

UC-1 arranged for the delivery of $6,300 USD to Parampreet SINGH in Sacramento, California, on February 3, 2021, as partial payment for approximately 2 kilograms of ketamine and 1.5 kilograms of opium previously purchased in Canada on November 8, 2020 (ketamine), December 9, 2020 (purported ketamine), and January 7, 2021 (opium). Another undercover officer ("UC-2") delivered the broker's fee to Parampreet SINGH on behalf of UC-1. MULTANI drove Parampreet SINGH to the meeting and accompanied him throughout.

### *MULTANI Coordinates Another 1 KG Sample Cocaine Deal on February 12, 2021*

Leading up to February 12, 2021, MULTANI agreed to sell another 1 KG of cocaine to UC-1 for $60,000 CAD in Brampton, Canada. MULTANI negotiated and then coordinated the deal from California through WhatsApp calls and texts. On February 12, 2021, with MULTANI directing, UC-1 purchased 1 KG cocaine for $60,000 CAD from Simranjeet Narang, the driver for the January 27, 2021 cocaine deal and one of the January 7, 2021 opium deals. Lab testing confirmed the substance was cocaine with 73% purity. After the deal, UC-1 told MULTANI the cocaine looked similar to from the previous deal and to work on obtaining a higher quality product.

### *MULTANI Coordinates a Deal for a Sample of Cocaine and Heroin in Vancouver, Canada and Offers to Supply up to 100 KG of Cocaine Per Month*

On January 6, 2020, MULTANI told UC-1 during a WhatsApp call that he had secured pricing for cocaine in Vancouver of $60,000 CAD per KG. MULTANI said he would have a sample made ready for UC-1. On January 14, 2021, UC-1 told Parampreet SINGH that UC-1 was working with MULTANI to make a connection in Vancouver. Parampreet SINGH responded that he had spoken with MULTANI and encouraged UC-1 to continue working with MULTANI on Vancouver. Parampreet SINGH also vouched for the suppliers in Vancouver, saying they were MULTANI's friends. Over the next couple weeks, UC-1 and MULTANI communicated multiple times regarding updates on UC-1's associates obtaining samples of cocaine and heroin. On January 29, 2021, MULTANI quoted pricing of $65,000 CAD per KG of heroin, which he called "pure form."

Eventually, UC-1 passed a number to MULTANI for a buyer of his in the Vancouver area, who was in fact an undercover officer ("UC-3"). MULTANI called UC-3 on February 5, 2021, using WhatsApp, and they agreed to arrange a day the following week for UC-3 to obtain a sample from MULTANI. In another call with UC-3 on February 8, 2021, MULTANI agreed to provide a one ounce sample of cocaine and said he could provide the "other stuff" too (i.e. heroin). When asked what he could deliver on a monthly basis, MULTANI said he could do 100 KG per month. He said he could do 10, 20, 30, 40, 50, and the quantity was not the issue but the timing. He said he needs a day's notice. In WhatsApp calls the following two days, they agreed to meet on February 11, 2021, and for UC-3 to obtain a one ounce sample of cocaine for $2,000 CAD with $500 off the next order.

On February 11, 2021, UC-3, as directed by MULTANI, UC-3 met with two of MULTANI's co-conspirators, Sukhvir Singh (who delivered cocaine in Brampton on January 27) and Maninder Dhaliwal, in the Vancouver area. Singh and Dhaliwal sold UC-3 one ounce of cocaine for $2,000 CAD

PLEA AGREEMENT                                    A-5

and gave UC-3 a sample of heroin. Lab testing confirmed the cocaine was cocaine with 87% purity and the heroin was heroin with 24% purity.

*MULTANI Coordinates a Deal for 2 KG of Cocaine in Vancouver on March 6, 2021 and Says He is Filling Orders for Other Customers of up to 10 KG of Cocaine at a Time in Vancouver*

From February 16-22, UC-3 and MULTANI exchanged many WhatsApp messages negotiating the pricing for an order of 10 KG cocaine; eventually MULTANI agreed to sell UC-3 2 KG for $56,000 CAD per KG. On February 27, 2021, MULTANI told UC-1 that his sales in Vancouver were going well and he was filling orders of 8-10 KGs and in other cases 3-4 KGs. They then discussed cocaine pricing and purity.

On March 6, 2021, as coordinated with MULTANI, UC-3 met with Sukhvir Singh and Maninder Dhaliwal in a Home Depot parking lot in Coquitlam, a suburb of Vancouver, where UC-3 purchased 2 KG of cocaine from Singh and Dhaliwal for $112,000 CAD. Lab testing confirmed each KG brick was cocaine; one was 91% purity and the other was 94%.

On March 8, 2021, Parampreet SINGH mentioned to UC-1 that he knew about the 2 KG that were sold in Vancouver and asked UC-1 about paying a broker fee to him and MULTANI. UC-1 advised Parampreet SINGH to speak with MULTANI since he had provided the introduction. Parampreet SINGH said once he and UC-1 acquired 50 KG of cocaine, trust would be built with the supplier and other people would be coming to them for cocaine.

*On March 11, 2021, UC-2 Purchases 1 KG of Cocaine from MULTANI, Parampreet SINGH, and Ranvir SINGH in Sacramento and Pays Them Broker's Fees for Canada Cocaine Purchases*

On February 19, 2021, after the second 1 KG cocaine deal in Brampton, Canada, UC-1 told Parampreet SINGH that the buyers were not liking the cocaine and that he was looking for higher quality cocaine from the United States. Parampreet SINGH said he would take care of it and discussed meeting a supplier in the L.A. area. On February 25, 2021, Parampreet SINGH told UC-1 that after the first KG of cocaine was cleared, it would be non-stop, and his guy (supplier) could do 100 KG. UC-1 said he would have his guy (UC-2) pick it up. On March 4, 2021, MULTANI called UC-1 via WhatsApp and said Parampreet SINGH had tasked him with picking up the money that UC-1 was sending to California to pay off the prior cocaine transactions in Canada (the January 27 and February 12 deals) and the new KG UC-2 would be purchasing. On March 8, 2021, UC-1 confirmed to Parampreet SINGH that his guy (UC-2) would be delivering the money for the one KG "sample" as well as $7,500 CAD owed for the prior cocaine transactions in Canada. UC-1 said that after the sample deal there would be more to follow.

On March 9, 2021, UC-1 spoke to both Parampreet SINGH and then MULTANI during a BOTIM call on Parampreet SINGH's phone, as they were both together. They coordinated logistics for the deal to occur two days later. Parampreet SINGH said he and MULTANI would coordinate the deal with UC-1 and UC-1 should not share their phone numbers with anyone. MULTANI also said the supplier had a large quantity of cocaine available. On March 10, 2021, UC-1 spoke with MULTANI over WhatsApp. UC-1 said the money would arrive soon and that UC-1 would send a picture of it. MULTANI then said the cocaine was "here" and "ready."

On March 11, 2021, UC-2 met MULTANI in Sacramento and paid him $45,890 USD as payment for 1 KG of cocaine ($40,000) and payment of brokers' fees ($5,890) for the two prior 1 KG

PLEA AGREEMENT  A-6

deals in the Toronto area on January 27 and February 12. Ranvir SINGH was also present during this meeting as a passenger in MULTANI's vehicle. Following this initial meeting, MULTANI and Ranvir SINGH left to pick up the cocaine. They returned some time later in a different vehicle, this time driven by Ranvir SINGH with MULTANI as the passenger. MULTANI handed UC-2 the bag with the 1 KG of cocaine and they left. Lab testing confirmed the cocaine was cocaine with 86% purity. Leading up to and throughout this time, UC-1 was in frequent phone communication from Canada with both Parampreet SINGH and MULTANI, coordinating details of the meetings and ensuring that the transaction occurred.

### *MULTANI Helps Coordinate Deal for 5 KG of Cocaine in Vancouver on April 7, 2021 and Gives Bulk Pricing for Orders of up to 50 KG of Cocaine; Authorities Seize the 5 KG of Cocaine from MULTANI's Co-Conspirators Before the Deal Occurs*

On March 10, 2021, UC-1 and MULTANI had a lengthy WhatsApp call in which MULTANI pressed UC-1 on his connection to the Vancouver contact (UC-3) and expressed fears that UC-3 could be a "snitch." MULTANI also asked if UC-3 was going to order more cocaine and discussed bulk pricing for orders of 20, 30, and 50 KG of cocaine.

On March 13, 2021, MULTANI spoke with UC-1 and said UC-3 told him the prices were too high. He said he did not believe UC-3 would buy bulk and that his suppliers made fun of MULTANI when UC-3 ordered only 2 KG. He said UC-3 told him he sold the cocaine for $60,000 and MULTANI wondered why he wasn't breaking it down and selling it for $100,000 per KG. MULTANI said that the pricing would remain at $55,000 per KG for UC-3 because he and his drivers needed to be paid. He said Parampreet SINGH had told MULTANI to let UC-3 go as a buyer. MULTANI said he takes direction from Parampreet SINGH. They also discussed how MULTANI could deliver the same cocaine from California to anywhere in Canada. MULTANI claimed he was taking all the risk because he had to get the cocaine across the border.

Between March 10 and 18, 2021, MULTANI also negotiated pricing with UC-3 for a 20 KG cocaine deal. MULTANI told UC-3 he would sell 20 KG of cocaine in Sacramento, California, for $36,000 USD per kilogram.

On March 30, 2021, Sukhvir Singh (who had sold the cocaine to UC-3 in Vancouver on February 11 and March 6 on MULTANI's behalf) contacted UC-3 and said that MULTANI told him to follow up with UC-3. They continued discussions over the next week and, on April 6, 2021, Singh agreed to sell UC-3 5 KG of cocaine for $265,000 CAD the next day. MULTANI and UC-1 were in communication about the negotiation of this 5 KG cocaine deal during this time to ensure the deal took place.

On April 7, 2021, Singh and Dhaliwal arrived in Coquitlam (near Vancouver), Canada with the cocaine and messaged UC-3 that they were there and waiting. A few minutes later, MULTANI sent UC-3 a WhatsApp message that they were there with the cocaine and could not wait. Later that evening, law enforcement seized 5 KG of cocaine from a Louis Vuitton bag that Dhaliwal was carrying as he and Singh left their hotel room. Lab testing in Canada confirmed each KG brick was cocaine; one was 90% purity, one was 91% purity, and three were 92% purity.

I, Amandeep Multani, have reviewed the Factual Basis in Exhibit A and, as far as my own conduct is concerned, I adopt it as a true and correct statement of my conduct.

Dated: 12/18/2022

_____
AMANDEEP MULTANI, Defendant