1              IN THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF CALIFORNIA
2

3    UNITED STATES,
             Plaintiff,
4                                      Sacramento, California
     vs.                              No. 2:21-cr-00078-JAM
5                                     Thursday, May 13, 2021
     PARAMPREET SINGH, et al.,        11:04 a.m.
6            Defendants.
     _____/
7

8                    TRANSCRIPT OF PROCEEDINGS
                     MOTION FOR BAIL REVIEW
9       BEFORE THE HONORABLE JEREMY D. PETERSON, MAGISTRATE JUDGE
              (Proceedings held via videoconference.)
10                        ---oOo---

11

12   APPEARANCES:

13    For the Government:          UNITED STATES ATTORNEY'S
                                   OFFICE
14                                 501 I Street, Suite 10-100
                                   Sacramento, CA  95814
15                                 By:  DAVID W. SPENCER
                                   Assistant U.S. Attorney
16

17    For the Defendant:          LAW OFFICES OF ALLEN SAWYER
                                   4578 Feather River Drive,
18                                 Suite D
                                   Stockton, CA  95219-6510
19                                 By:  NEAT ALLEN SAWYER
                                   Attorney at Law
20

21    Official Court Reporter:    Thresha Spencer,
                                   CSR, RPR
22                                 501 I Street
                                   Sacramento, CA 95814
23

24
     *Proceedings recorded by mechanical stenography, transcript*
25   *produced by computer-aided transcription*

1    SACRAMENTO, CALIFORNIA, Thursday, May 13, 2021, 11:04 a.m.

2                              --o0o--

3    *(Proceedings were held via the Zoom application.)*

4              THE CLERK:  The United States District Court, Eastern

5    District of California, is now in session.  The Honorable

6    Jeremy D. Peterson, presiding.

7       Calling criminal case 21-00078-JAM; United States versus

8    Amandeep Multani.  We're on calendar today for defendant's

9    motion for bail review.

10             THE COURT:  Thank you, Nick, and good morning to all

11   of you.  Let's start with appearances.

12      Could I get appearances from the government, please.

13             MR. SPENCER:  Good morning, your Honor.  David

14   Spencer for the United States, and we consent to appear by

15   Zoom.

16             THE COURT:  Good morning, Mr. Spencer.  And for the

17   defense?

18             MR. SAWYER:  Allen Sawyer for Mr. Multani.  I'm

19   appearing by Zoom, and my client is also appearing by iPad from

20   in custody, and we both consent to it being on Zoom, your

21   Honor.

22             THE COURT:  All right.  Good morning to you,

23   Mr. Sawyer and Mr. Multani.  I see you there.  Can you raise a

24   hand if you can hear me?

25             THE DEFENDANT:  (Defendant complies.)

1          THE COURT:  All right.  Good morning to you.  I note

2     that the defendant raised his hand indicating that he can hear

3     the Court, and all parties have consented to proceed by Zoom

4     this morning.

5          So we're here on defendant's motion for bail review under

6     3142(f)(2).  The first issue we need to consider is whether

7     there is, indeed, new evidence as to planning on reopening the

8     proceedings.  The United States does not contest -- does not

9     dispute that there is new evidence -- and I do find that there

10    is new evidence -- at least two sorts.

11         I understand that there's been some additional security

12    that's been identified by the defendants, and then the

13    government has also introduced some jail calls.

14         The defendant has filed a few last minute briefs, one

15    before the last hearing and another one this morning very

16    early.  I've reviewed them, and I believe everything else that

17    has been filed in this case.  So we're here for, again, a bail

18    review hearing.  The defendant is subject to a rebuttable

19    presumption that he is a danger and a flight risk because he's

20    been charged with a controlled substance violation with a

21    maximum sentence of ten years or more.

22         Mr. Spencer, is the government still seeking detention?

23         MR. SPENCER:  Yes, your Honor.  Based on the

24    presumption that you mentioned, the Pretrial Services report,

25    and I'm prepared to -- and the government's filings, I'm

1   prepared to address any questions from the Court and argue the

2   matter.

3               THE COURT:  Okay.  Thank you, Mr. Spencer.  So let me

4   just ask a few questions to get things started, and then we can

5   have further argument from both parties, if appropriate.

6       I just -- I'm not quite sure, based on the filings in front

7   of me, if I understand defendant's immigration status.  The

8   pretrial report, which is a few days old at this point, but

9   notes that he states that he's out of status, I believe.

10  Defendant's most recent filings says the opposite.  It says

11  he's legally in the United States.

12      It seems that initially years ago the defendant overstayed

13  his likely tourist visa, overstayed his visa of some sort, then

14  sought asylum.

15      I gather he attempted to withdraw that asylum application

16  and departed the country.  Initially, at least, it seems that

17  it didn't get withdrawn.  The defendant departed the country

18  and at some point came back.  I guess I'm not sure that I

19  understand whether that departure terminated his asylum

20  application or what his current situation is.

21      Mr. Sawyer, maybe I'll start with you.  Can you help me

22  understand the defendant's status?  Does he still have status

23  as an asylum applicant currently, that's one question.  And the

24  second question, is there an immigration hold?

25              MR. SAWYER:  Your Honor, my understanding is, is that

1  it is twofold.  First of all, the last Pretrial Services report

2  that was filed was -- I'm grateful that they ran an updated

3  immigration check -- and on that -- I apologize, I don't know

4  if I cut out there.  But they ran an upgraded immigration

5  check, and that the indication was that the order that would

6  allow for immediate deportation had been lifted, and it was

7  lifted based on the fact that they -- I believe that there is

8  finally the process of upgrading his immigration paperwork

9  occurred.

10     And what that is, is that he entered the United States

11  legally, as indicated by Pretrial Services.  And then we are

12  provided documentation to the Court that he filed for an asylum

13  under the immigration laws of the United States.  Therefore, at

14  that point he is -- after 30 days, he's actually legally

15  allowed to work now under that -- under the immigration laws of

16  the United States.

17     And the Pretrial Services update indicates everything I

18  just said.  It doesn't give us much detail because it doesn't

19  have the asylum application which I provided to the Court.  But

20  what it has is that they updated it to show that he lawfully

21  entered the United States.

22     So let's go back to the original proceeding we had.  At the

23  time of the original proceeding, the indication was that there

24  was a deportation order -- there was a deportation order.  I

25  apologize, I don't know why my screen --

1            THE COURT:  We're hearing you and seeing you just

2      fine, Mr. Sawyer.

3            MR. SAWYER:  There was a deportation order that -- at

4      the time he entered the country at the last moment, that the

5      paperwork had not been processed appropriately by immigration,

6      so that's why it showed a deportation order.

7         But, fortunately, it's been updated, and it's not -- and

8      that information was provided by Pretrial Services which is

9      great.  So, based on my understanding of the immigration laws

10     of the United States, he is currently legally in the country

11     under a lawful entry and appropriately filed immigration status

12     as asylum, which has not been approved but is pending.

13           THE COURT:  So I do understand that somebody can be

14     considered to be illegally in the United States when they have

15     a pending asylum application.  I also understand that the

16     defendant might have lawfully entered the United States, but I

17     don't understand what you mean what you refer to it being

18     "updated."  What has been updated?  Has his status been -- does

19     that mean that the application has been uncanceled?

20           MR. SAWYER:  I believe that's the only legal

21     interpretation based on what Pretrial Services has given to the

22     Court.  Pretrial Services had the initial report that they

23     filed in this case, had the deportation order.  That was his

24     current status, that he was pending a deportation order.

25        That has been lifted, according to the updated information

THRESHA SPENCER, OFFICIAL COURT REPORTER, USDC

1    provided by Pretrial Services, which is consistent with what

2    our legal understanding was at the time of the original

3    hearing.  Everything that we presented to the Court has fallen

4    into place now with the updated information provided by

5    Pretrial Services.

6              THE COURT:  Okay.  So I gather your view is that the

7    deportation order has been lifted.  Is there -- I think this

8    would be a separate thing.  Do you know, Mr. Sawyer, whether

9    there is an immigration hold currently?

10             MR. SAWYER:  I do not know that.  I would say -- I

11   would ask -- I would defer to Pretrial Services who last did an

12   update on it.  And based on what Pretrial Services presented to

13   the Court, I believe there is not an ICE hold at this point.

14             THE COURT:  Okay.  Well, I'm looking at the most --

15   what I believe is the most recent of the three reports from

16   Pretrial Services, and it does state that defendant is "not

17   legally residing in the United States."

18        Let me just ask Ms. Mirgain.  Do you have any information

19   subsequent to that, or is there anything that's changed your

20   perspective on whether the defendant is legally residing in the

21   United States?

22             PRETRIAL SERVICES:  Your Honor, I have not run an ICE

23   check since May 5th, but the wording in the report on May 5th

24   that says he's a nonimmigrant overstay, he was legally admitted

25   on September 17th, 2019.  If he is to remain longer without ICE

1  permission, he may be in violation of immigration law that I

2  obtained directly from the ICE check.

3          THE COURT:  Okay.  Thank you, Ms. Mirgain.

4      Mr. Sawyer, I don't understand.  How do you get to legally

5  residing in the United States from that?

6          MR. SAWYER:  Because the words were "may."  And that

7  if he didn't file an asylum application, then he would be

8  overstaying his visa, his tourist visa, and then he would

9  have -- he would be subject to a -- an illegal status in the

10  United States.

11          THE COURT:  But the application for asylum was filed

12  prior to his departure and returned to the United States.  So

13  his recent return to the United States occurred while that

14  asylum application was out there, there had been a request to

15  cancel it -- apparently, there may have been a request to

16  uncancel it.

17      But how does that -- it seems like the key we need to know

18  here is whether that asylum application is current and pending.

19  If he's here on a tourist visa, it sounds like he's over that

20  status.  So I have a lot of questions about whether that

21  departure, you know, and the impact of that departure and

22  return on the asylum application and any status he might have.

23          MR. SAWYER:  Like we indicated at the previous

24  hearing, he filed an appeal for his asylum based on his reentry

25  and his desire to put forward the asylum application.

1          And that had not been processed at the last hearing that we

2     had, and that's why he showed a deportation order.  And now

3     that has been processed, it's the only logical explanation of

4     why ICE removed the deportation order from his status that

5     Pretrial Services verified.

6          THE COURT:  Okay.  I just want to make a point that I

7     think there's three things here:  One is whether or not there's

8     a deportation order.  That would be an active presumptive

9     determination by immigration authorities that the defendant

10    should be deported.

11         Second, it's an immigration hold, which would be defendant

12    saying, "Listen, when you're done with the federal case or

13    prior to release of the defendant, we want a chance to consider

14    an issue," different from a deportation order.  It's not

15    necessarily a deportation determination.  But it's saying,

16    "Listen, we've got to think about it."

17         Third, there's a question of whether, at the end of the

18    day, the defendant is legally residing in the United States.

19    It seems like those are three issues, and I just don't want

20    them to get compounded here.

21         Let me ask the government.  Mr. Spencer, do you have

22    any information or perspective to add here?

23         MR. SPENCER:  Your Honor, I don't have any

24    information on the specific facts beyond what Pretrial Services

25    has and ran just a little over a week ago.  I can say that I

1    checked with -- I'm not an immigration lawyer or an expert by

2    any means, but I checked with immigration authorities just to

3    ask how this would work in practice.  And my understanding from

4    that was, assuming defense's representation is correct that

5    there is an asylum claim and/or appeal pending, and so assuming

6    that's correct, then ICE would not take into immigration

7    custody if he were released in this case -- and would not

8    deport him because the asylum claim is still pending.  So

9    that's my understanding.

10         And then just from the government -- a little more off

11   topic -- but from the government's perspective, in some ways

12   all of these things matter less than just the fact that if he's

13   convicted in this case, he's facing almost certain deportation

14   because the asylum claim would be defeated on that basis, but I

15   can't give the Court any more specifics on the current status.

16              THE COURT:  Okay.  Thank you, Mr. Spencer, that all

17   makes sense to me.  I'm just -- I'm focusing on the statement

18   in defendant's brief that defendant is legally residing in the

19   United States.  It seems like there's potentially some

20   uncertainty about whether we can say that at this point, either

21   one way or the other.  And I'm hearing some comments.  It seems

22   like the deportation order has been lifted, but I don't -- I

23   don't want to draw inappropriate conclusions from that.

24         If that's the information that we have, as I understand the

25   law, that doesn't mean that even -- that the defendant is

1    necessarily legally residing in the United States.  He might

2    be -- he might well be.  I certainly understand that somebody

3    with an active asylum application could be legally residing in

4    the United States, setting aside the issue that that status

5    could be in peril, as you know, Mr. Spencer.  I just don't know

6    that we have the information here to solidly say the defendant

7    is legally residing in the United States, but maybe I'm missing

8    something.

9        Mr. Spencer, do you agree with my analysis there?

10             MR. SPENCER:  I do, your Honor.  I am not certain

11   whether he is legally residing in the United States, and I

12   think your Honor is asking the correct factual questions, and,

13   unfortunately, I just don't have the answers.

14             THE COURT:  Okay.  Mr. Sawyer, am I understanding the

15   situation correctly, or am I getting something wrong?

16             MR. SAWYER:  Yeah.  I think the only thing that the

17   Court -- and I'm not saying the Court is missing it or maybe I

18   didn't make it clear.  I mean, we provided information that

19   Mr. Multani, prior to this case, was represented by an attorney

20   in New York for immigration, and that attorney has provided us

21   information that -- that there is a pending appeal on his

22   asylum.

23       Under immigration law in the United States when you have a

24   pending appeal, you cannot be deported during the pendency of

25   that appeal until that is resolved.

1       And I think what adds more weight to what I'm saying is the

2    fact that there has been an adjustment of his immigration

3    status as presented by Pretrial Services.  That is a standard

4    term used, even if someone is pending asylum or if they are

5    having a pending appeal related to the asylum, it is going to

6    say that he entered the country illegally, and it's going to

7    say if he stays beyond this date, he may be in violation of

8    law.  Because that system does not track or identify whether or

9    not someone has pending asylum appeals or pending asylum.  So

10   there's not going to be a reporting on his immigration status

11   that says that.

12       But what it will do is it will not allow a deportation

13   order to be entered, and that is what occurred in this case.

14   So I'm not saying it's -- it's actually -- diving into this

15   immigration process has been nothing but frustrating as far as

16   understanding how difficult it is to get current information,

17   especially in COVID because there has been a delay in

18   processing which occurred in Mr. Multani's case.

19       He was -- there's been a long delay in getting the status

20   changed back from the deportation order to a status where he is

21   not facing a deportation order.

22            THE COURT:  Okay.  I think I understand that, and I

23   think that all makes sense to me.  Certainly I'm aware that

24   there are often delays in processing immigration documents, and

25   there can, I imagine, be mistakes.  There certainly can be time

1    lags between communication here and there, and it's a large

2    system, and it hasn't always processed things immediately, to

3    put it mildly.

4        And I just want to make sure that I'm seeing everything and

5    I'm giving your client the benefit of absolutely everything

6    that I can.

7        I'm looking at the exhibits here.  Is there something -- is

8    there -- this paperwork that you reference coming in from New

9    York, is this one of the exhibits that I should be looking at

10   here?  I think I've been through them all, but I want to make

11   sure I'm not missing anything.

12             MR. SAWYER:  I believe it was the first briefings

13   that we did for the first hearing, is where it is.  And I

14   apologize, I don't have it in front of me.  I'm at my house for

15   this Zoom, and I don't have all those exhibits in front of me.

16       But I will say this:  If there is an issue on this, I have

17   no problem that I will submit it to the Court if it would

18   impact -- if we can't find it, I'll make sure that it's with

19   the Court forthwith.

20             THE COURT:  And my concern, Mr. Sawyer, is just

21   that -- I think you've got some points to be made.  My concern

22   is you may be going farther than what is fully supported in

23   saying that he is legally residing in the United States.  I

24   don't know that it matters one way or the other.  I think we

25   all have a shared understanding of what the actual situation

1  is, but, you know, I think I would say that I don't have it in

2  front of me, and there are 12 exhibits, including many subparts

3  to other exhibits filed for today's hearing.  I'm not seeing

4  anything that I look at and that, you know --

5          MR. SAWYER:  I do have it in my phone.  I have the

6  documents provided to our firm from Gursoy Law Firm in New York

7  that has the exhibits for the motion to reopen his asylum and

8  all the filings that were done in that case.  I have it in an

9  email right now.

10          THE COURT:  Okay.  Well, let's go on to other issues

11  here.  I don't think that issue, in terms of the determination

12  that I need to make today, is likely to be determined.

13      So there are some concerns on behalf of the United States

14  and on behalf of Pretrial Services about defendant being

15  completely straight with the Court.  They identified a few

16  issues that they have concerns about.  One of those being

17  finances, another being, you know, maybe a subpart of that, the

18  extent to which defendant has involvement in or control over

19  finances or corporate entities that might be associated with

20  his father.

21      Separate from that, there are concerns about whether

22  defendant was entirely straight coming out of the gate in terms

23  of his employment.  And then I would ask for a perspective on

24  criminal history.  I certainly understand defendant's argument

25  that lists this criminal history that is alleged to have

1  occurred here, which consists of numerous arrests, and cases

2  all of which appears to me have either been dismissed or

3  resulted in acquittal.  In other words, there are no identified

4  convictions.

5      But I -- I'm curious whether we have learned about these

6  arrests in a piecemeal manner such that the defendant did not

7  initially disclose these.  I don't think the government has

8  argued that, but it seems like we had a different perspective;

9  that is, that there is only one such case the first time

10  around, and now we're hearing about a large number of them.

11  I'll hear first from you, Mr. Sawyer.

12      Anything to add?  I've read carefully your briefing that

13  goes through one by one all these different claims and explains

14  in your view why I shouldn't be concerned about it, but I'll

15  note it does seem that there's been a shifting there.

16      Anything further to add, Mr. Sawyer?

17          MR. SAWYER:  Your Honor, all the documents relating

18  to the incidents in India the defense provided.  This is --

19  this was all part of his asylum application.  This is actually

20  the leading reason he's seeking asylum.  There were other

21  incidents that were not where he was -- for example, he was

22  charged millions of dollars for a PG&E bill by a local official

23  that made big news over in India because it was viewed as

24  harassment.

25      Likewise, his vehicle that he was driving in was assaulted

 1   by people where they threw rocks at him.  But the bottom line

 2   is this, you know, he described it from the beginning.  To me

 3   he considered it a course of events.  I would give it analogous

 4   that, you know, that there's many little pieces of this history

 5   that we have provided all of it, but, I mean, he -- there was,

 6   you know -- it took us a while to collect all these documents

 7   and get all the proof that we have that there was a dismissal.

 8   I mean, that's one of the challenges when you have somebody in

 9   custody is you're trying to -- and we're left with family

10   members that are trying to get you this stuff, and they don't

11   know it as well as your client.

12       And so we did it as fast as we could, and the bottom line

13   is this:  There's nothing more that a person can do when

14   they're charged with a crime other than go to court and face it

15   and go through the process, and that's what Mr. Multani did.

16   And I think it's very powerful with the actual comments that

17   the judges made in those cases.  It's comments like, "There is

18   not a scintilla of evidence supporting these allegations."

19       Granted that the initial arrest, which I understand has

20   been quoted by Pretrial Services, include the falsehoods that

21   were dreamt up by the persecuting local authorities in that

22   case.  But, at the end of the day, there was never anything

23   that -- that ended up supporting it.  That's the bottom line.

24           THE COURT:  I get that, and I'm not sure there's any

25   dispute about that, and that all makes sense.  I guess my

1   concern is not necessarily addressed by that, though, which is

2   whether -- whether Mr. Multani was direct with Pretrial

3   Services the first time he was asked about his history.  And

4   what you're saying is somewhat different.  This is a loan

5   application, he discussed it with you, but that's not actually

6   what I'm asking about.

7          MR. SAWYER:  Again, he described it as an attempted

8   murder, okay?

9          THE COURT:  Yeah.  And that's one case.  But we

10  have --

11         MR. SAWYER:  I mean, he led what he described -- to

12  him that was the biggest one that he was in custody for, and I

13  don't --

14         THE COURT:  There we have an attempted murder.

15  Listen, let's just presume that these are all completely bogus,

16  but we have an attempted murder charge in 2007, in 2010,

17  another one in 2010, and the one in 2012.  Now, that's not just

18  one attempted murder, that's several different charges.  It

19  sounded like that information has been slowly bled out rather

20  than coming straight to Pretrial Services.

21         MR. SAWYER:  I mean, I wouldn't characterize it that

22  way.  I think he said that there was an ongoing campaign of

23  political persecution that he faced.  I don't -- I didn't

24  have -- there was some confusion on my part as I was drafting

25  this and catching up to this that I didn't have the asylum

1  package which he told me how to go get.  And he said it would

2  be all in there, all the details, and it was.

3     And then the family helped me get the actual court

4  documents, but they had an imperfect recollection of exactly

5  what that all entailed.  I mean, he described it as an ongoing

6  campaign of political persecution that was going on for years.

7  He said that he had come to the United States for that purpose

8  and went back when there was a change in the political regime

9  in India at that time hoping that it would be better.  And he

10 wanted to go back to India at that point.

11    When he went back, what he encountered was a lot of the

12 local officials that were harassing him were still in power in

13 those areas, and it didn't lessen what he was experiencing,

14 which were documented by newspaper accounts of some further

15 harassment that he encountered, so he came back to the United

16 States.

17    I feel like he's been very transparent from the beginning

18 about it.  I don't disagree that perhaps there could have been,

19 you know, a better breakdown of the narrative from the

20 beginning.  We went as fast as we can in putting this stuff

21 together.

22    I mean, I think Mr. Spencer will tell you we had a little

23 discussion earlier.  This is one of your more complicated bond

24 proceedings either one of us have encountered.  There's so many

25 moving parts, there's so much more material.  I don't disagree

1  why there would be some reluctance on the part of Pretrial

2  Services and Mr. Spencer based on this morass of information

3  we've done.  But we have been collecting it, and it's always

4  been -- there's been nothing that I've uncovered to provide

5  support that has contradicted what my client has told me from

6  the beginning.  So that's what I would say in regards to his

7  truthfulness related to the arrest in India.

8      I never meant to characterize it that he came to me and

9  said, "There was only one incident that happened in India was

10  this attempted murder."  That's not the way he said it.  He

11  said it was an ongoing pattern of harassment.  I just didn't

12  have the details.

13      I put the -- and as soon as I got it I put it forward, and

14  he told me how to get it.

15              THE COURT:  Okay.  Let me ask Officer Mirgain.  Do

16  you have any perspective here that you feel like the narrative

17  provided by defendant with regard to his criminal history was

18  somewhat shifting like the narrative in your view was regarding

19  his finances and his employment and his travel to the United

20  States?

21              PROBATION OFFICER:  I will say it was definitely a

22  surprise to get paperwork for what, six different cases,

23  because it was my understanding it was just one.  I don't know

24  that he specifically said it was just one, but he didn't say it

25  was more than one, and I didn't know any better to ask any

1    different.

2                    THE COURT:  Thank you, Ms. Mirgain.  That makes

3    perfect sense.

4        Mr. Spencer, what's your perspective on that particular

5    issue?

6                    MR. SPENCER:  I don't have anything to add, your

7    Honor, to Ms. Mirgain since she's the one who interviewed him.

8    I, too, am surprised there were multiple cases, but I just read

9    what's in the reports which reflects exactly what Ms. Mirgain

10   is saying.

11                   THE COURT:  Well, let's shift to the jail calls.  And

12   I think Mr. Sawyer has done a reasonably effective job of

13   responding and providing an explanation of these, and I think

14   there may be five -- at least the five transcripts and the

15   exhibits that I've gone through.

16       Given the response of Mr. Sawyer, what is the government's

17   view of the significance of these jail calls?  Do you feel that

18   your concerns are allayed, or do you still have some concerns

19   based on those jail calls?

20                   MR. SPENCER:  I think partially, your Honor -- so a

21   few comments.  The calls about the U-Haul truck, I think the

22   explanation makes a certain amount of sense.  I think it's a

23   little bit maybe of a dramatic phrase to say "draining the

24   account," which is kind of what caused, I think, the government

25   in the agent's eyes.  But I can understand why $100 a day --

1    given somebody verified it that way and maybe something was

2    lost in translation.  So I think that one has kind of been

3    neutralized in terms of the concern it raises for the

4    government with the attempts.

5        I do still have -- I think -- well, to cut to the chase.  I

6    think the one that causes the government the most concern is

7    still the one about the urgency to obtain a passport for the

8    minor daughter, and especially the urgency part.  Because I do

9    not understand the explanation of -- it sounds like the

10   explanation is the concern is that at some point down the road

11   Mr. Multani could be convicted which would lead to his asylum

12   claim being denied, and therefore his wife would need to

13   somehow establish an asylum claim in her own right.  And,

14   therefore, that means she needs to go back to India.

15       And because Mr. Multani is in custody, she needs to take

16   the daughter with her so that she can go back to India and come

17   back to the United States to reestablish an asylum claim.  And

18   the government is concerned that, basically, the instant he is

19   in jail and they're talking about him getting out, they're

20   rushing around trying to get a passport and a visa for the

21   daughter who is the only one who can't reenter India without

22   such immigration documentation.

23       So that was the biggest concern.  There's also a concern

24   that kind of goes to a broader concern, which is there's the

25   discussion of a couple of accounts on there that are clearly

1    under Mr. Multani's control, even though I know that their

2    business account is in his father's, but funds he has access

3    to.

4        And then there's the other call about kind of making things

5    right on the back end or a third party exchange could

6    compensate somebody for a profer they can't sell.

7        And the defendant's response which, I mean, I'll readily

8    admit the calls have their ambiguity in them and so they're

9    open to interpretation.  Maybe the defense's response is

10   correct about they're talking about properties in India and

11   telling him to get cash bond.  But it kind of goes to this

12   overall progressive disclosure problem that we're seeing.

13   Which is we started the initial bail hearing with the

14   defendants making $3,000 a month from his father's company.

15       And then we find out about he's doing business in his

16   father's name, and Pretrial uncovers that in this first

17   investigation.

18       And then the government finds stuff on his phone that was

19   seized suggesting that there is a gas station and a check

20   cashing business.  And the explanation, "Oh, he's working for

21   the gas station under-the-table, and maybe he just has access

22   to accounts but it's owned by somebody else."  But then there's

23   these additional businesses that he's involved in, and then

24   there's these real estate transactions, and then there's all

25   these family properties in India that could be liquidated.

1       So I agree the defense has done an effective job of

2   explaining some of the jail calls, which I tried in my initial

3   filing -- we got the information late -- I wanted to bring it

4   to the Court's attention because I thought it was pertinent.

5   There was some ambiguity there.  But it does leave the

6   government with some concerns over whether there could be a

7   plan to flee, and also just these -- kind of the recent picture

8   of the ability to obtain financial resources for liquidating

9   real estate for hiring lawyers in New York and hearing all

10  kinds of things, that there could be more assets there where he

11  could basically forfeit the $1.5 million and skip town.

12          THE COURT:  Okay.  Thank you, Mr. Spencer.  I may

13  have asked you this, Ms. Mirgain, at the beginning, but just to

14  be sure.  Does the Pretrial's recommendation remain detention

15  for the reasons stated in your May 5th report; is that correct?

16          PRETRIAL SERVICES:  Correct, your Honor.

17          THE COURT:  Okay, thank you.

18      Mr. Sawyer, with the understanding that I've read carefully

19  your submissions.  Anything further I should know at this point

20  before I rule on this motion?

21          MR. SAWYER:  Yes, your Honor.  The government partly

22  correctly stated what the -- regarding the issue related to the

23  passport renewal of the child.  It's important, though, to

24  understand the full picture that was not part of that answer,

25  which is why the wife's status was -- she was out of status.

 1   Her passport is expired.

 2       At the time that these calls were being made, there was a

 3   deportation order facing Mr. Multani.  And none of these

 4   individuals are experts on federal criminal law or immigration

 5   law.  What they know is that the government was making the

 6   concerns that he could be deported.  They were actually really

 7   believed there was a possibility that he could be deported at

 8   any time.

 9       If that were to occur, his daughter, whose passport was

10   also expired, could not be renewed by one parent, especially a

11   parent who has no valid U.S. passport and no valid even Indian

12   passport at that point.

13       So this was a concern of how to protect the child in

14   whatever eventual issue could develop is that the child would

15   not be stranded.

16       And there -- and in our motion, and they said over and over

17   again, they are all willing to give their passport, surrender

18   them to the Court.  Even though legally, of course, normally

19   the Court would never ask for a family member's passport, but

20   they don't want to be the basis of a reason why Mr. Multani

21   would be in detention based on the belief that their access to

22   a passport would give him an incentive to want to flee the

23   country.

24       So it's a very innocuous, understandable parental goal and

25   motivation that they had, so that's related to that issue.  You

1   know, I understand that this is a very complicated moving bail

2   scenario -- bond scenario.  But the bottom line is this, all

3   the accounts and everything that they referenced are diminimous

4   in this case.  You're talking about a trucking company that

5   didn't start until the end of January this year.  I have

6   provided the ledgers and the every haul that's ever been made

7   by this trucking company.

8       At first there was a concern that this trucking company

9   could have been used in some nefarious purpose, and I

10  understand that based on these allegations that I don't

11  disparage the government having concerns.  You know, they filed

12  this case for reason, and, like all three defendants, this is

13  supposed to be presumed an accurate description of what

14  occurred for purposes of bond.

15      But the bottom line is this.  We're looking at two things

16  in this case.  We're looking at whether or not he will return

17  to court and whether or not he is a danger to the community.

18  There is absolutely no evidence in front of this Court

19  whatsoever that he would be a danger to the community, zero.

20      There is -- so we're really talking about whether or not he

21  will appear in court in the future.  And there are conditions

22  that could be levied against Mr. Multani that would make it

23  very unlikely that he would ever flee.  I mean, you're looking

24  at a situation where his sister is putting up her primary

25  residence, she has a special needs child, and it would

1    absolutely devastate his sister if she were to lose her house.

2    She is a working --

3         (Cell phone interruption.)

4              THE COURT:  I ask that everybody silence their

5    phones.  I think, Mr. Sawyer, that might be on your end.

6              MR. SAWYER:  Yeah.  I apologize, your Honor.  There's

7    three phones by me.  I just turned off two of them, I just

8    turned off the third.  I apologize.

9       My computers for some reason adopts the phone and makes the

10   sound even when I turn it off, but I apologize.

11      The -- so the sister would be absolutely devastated if

12   there were to be -- if her house were to be seized in his

13   attempt flee.  She has a husband, multiple children, and she

14   has a career and she works in New Jersey.  The idea that

15   there's been no money that's been identified by the government

16   that indicates that there's any way that this wouldn't be

17   anything other than devastating to the people that have lost.

18   I mean, there is speculation that my client may have access to

19   money, but at every stone that we've unturned, any account, any

20   history, it's diminimous.  And as far as the disclosure that he

21   worked for his father's business did come from him.  I mean,

22   this was not something that was uncovered by -- all this

23   information we have turned over to the government and to the

24   Court.

25            The check cashing places, he was absolutely correct.  He

1    did not own them, those are real people.  We know who the

2    people are.  So the story has been validated more -- with

3    further inquiry than the reverse.  This is not a case where

4    it's getting worse as we look closer, it is getting much, much

5    better, including the fact that there is triple the amount of

6    collateral that we had before.  I do believe there are

7    conditions this Court could do that would assure that

8    Mr. Multani would appear in court.  This is going to be a long

9    road in this case.  It is a huge burden to hold him in

10   detention throughout these proceedings.  I would argue that if

11   you look at the other two co-defendants, they had significant

12   aspects that were going against them where they were allowed to

13   be released in this case, including criminal convictions,

14   including other federal drug charges that were levied.

15       So the idea that Mr. Multani has absolutely no criminal

16   history, has extremely low access to resources, which cannot be

17   demonstrated any stronger by the fact that he was living in an

18   apartment with his parents and in a small little apartment

19   during -- very recently, that he had access to all this money,

20   it defied common sense when you look at the reality of how he

21   was living his life.

22       So based on that, your Honor, I don't think it is fair to

23   characterize.  Because of the complexity of this, it is so much

24   harder to explain that he hasn't been forthright.

25       And if you look at all the evidence that the defense has

1    presented to this Court, and I've done a fair amount of these

2    myself, and this is an unusual amount of evidence that I've had

3    to collect, going across continents to different countries

4    involving -- trying to get things transcribed or getting, you

5    know, having interpreters help me track this stuff down,

6    getting assistance of people in India tracking this stuff down.

7        I have deeds that I've just got of houses to make sure that

8    they had been owned well before this incident ever occurred,

9    some of them going back to when he was a child.  And their

10   entire value is not a lot, but, you know, the point is that

11   we've done everything we can to be as forthright and truthful,

12   and it will require the cooperation of my client.  It's not

13   like I went out and did this on my own.

14       It has been a herculean effort between his family and

15   Mr. Multani to collect all this information, and we've been --

16   you know, we've given absolutely everything we can and will

17   continue to do so if asked.

18            THE COURT:  Thank you, Mr. Sawyer.  I appreciate your

19   argument and I think I understand it all.

20       Mr. Spencer, anything further to add at this point?

21            MR. SPENCER:  I'd just like to respond briefly to a

22   couple of points, your Honor.  Mr. Sawyer said there is no

23   evidence of danger.  There is a presumption, but I also think

24   the allegations that are in the complaint affidavit are

25   significant, at least insofar as they show a leadership role

1  based on many recorded calls, people that Mr. Multani

2  controlled.  And some of these are in the government's brief as

3  well as the complaint affidavit.  And that he's involved in

4  large international drug transactions involving lots of money,

5  and there's statements about him connecting people in

6  Afghanistan, India, Germany, United States, Canada.  So I think

7  those allegations do go to danger, and I think in terms of

8  conditions that the Court could fashion to mitigate danger.  I

9  mean, I think ankle monitor, restrictive home-detention-like

10 conditions would help.  But most -- basically, the crimes in

11 this case were committed primarily by cell phone and by

12 brokering and orchestrating international drug deals, so there

13 is concern of danger beyond just the presumption.

14     Second, in terms of comparing Mr. Multani to his

15 co-defendants.  One of the co-defendants did have some criminal

16 history, I believe he had a felony that was then later reduced

17 to a misdemeanor.  I don't believe there were any federal

18 charges in the past.  I think there was a prior arrest with a

19 significant amount of cocaine, but the case was dismissed for

20 one of the co-defendants.

21     But the key issue for all three of these defendants, I

22 think, is flight risk, and I think what we're all focused on.

23 And in that respect, Mr. Multani, I think there's significant

24 concerns beyond the other co-defendants because of his

25 immigration status, and the fact that, if convicted, he's

1   facing almost certain deportation.  And because he doesn't have

2   the same family ties to this country as the other

3   co-defendants.  So I don't think that's a point that

4   distinguishes him favorably from the others, I think it puts

5   him in a tougher position because of the flight risk, but it is

6   still concerning to the government.

7       And then, finally, I understand the defense's point about

8   diminimous assets.  I mean, I wouldn't call 15 or $20,000

9   diminimous, but certainly $1.5 million is a much bigger bail

10   amount than what we had offered last time.  And it's true, I

11   can't point to $3 million of money in a specific account that

12   the government has uncovered.

13       But each time we kind of get this progressive disclosure

14   about additional businesses and properties in India, and we're

15   not talking about diminimous amounts of money.  They're able to

16   come up with this money, they're talking about losing money

17   around -- more money for cash funds, lots of money for lawyers.

18   I mean, these are significant amounts of money.  So the

19   government's concerns are based on, yes, I guess I could

20   characterize it as we don't have the hard evidence to point to

21   an account, but we keep finding out more and there's enough

22   there to be concerned.

23          THE COURT:  Okay.  Thank you, Mr. Spencer.  Any

24   response, Mr. Sawyer?  There's no need for any, just I'll give

25   you an opportunity if you wish to.

1          MR. SAWYER:  I'll be very brief.  That the things

2   about raising money for lawyers and raising money for bonds and

3   everything.  Are people, not Mr. Multani, there's not this

4   access to, other than any defendant has a sympathetic parent,

5   their parent could try to help them in raising money, and

6   that's what we have in the property in India.

7       And I just don't agree with the characterization.  I agree

8   it took a while to get clarity on his entire circumstance, but

9   it wasn't from a lack of him being candid, more it took a while

10  to put these pieces together.  Some of them were to dispel

11  thoughts.  There was an assertion that he owned a gas station,

12  that he owned a check cashing, and that there was not real

13  people behind that.  So there's some of that that has been

14  clarified in the opposite direction of doing that.  Other than

15  that, I would call it diminimous, that he actually has access

16  to.  We're talking about the trucking account that has

17  independent operators that ride, that I provided his paperwork.

18  $20,000 in the bank account doesn't mean that is available as

19  of net.

20      They would have to not be paying drivers and so forth to

21  take out that $20,000.  That trucking company is still

22  operating while Mr. Multani is in custody, which is further

23  proof of his assertion that it was not only his -- he was

24  working in it under -- and his father had the authority of the

25  motor carrier, but it is still operating, which is quite

1    insightful that it supports his position.

2         The same thing with the tire position.  Again, diminimous,

3    very small activity.  Again, I think it's important if we were

4    to make a detention finding that he's not entitled to bond,

5    that there has to be something that we can articulate that,

6    "Here is the money he has" -- if we're relying on the fact that

7    he has these hidden resources that he could flee the country

8    with, is that they have to be able to identify it.  There is

9    not this pot that has been identified, one.

10        Two, yes, if he's convicted he will be deported.  He will

11   very likely be deported in that case.  Not certainty, but very

12   likely.  But he fled that country.  The idea that he's going to

13   try to run to there and -- to the country that he's trying to

14   flee, I don't think is really substantiated.  Other than that,

15   he does not have real strong ties to any other country.

16        And, look, his parents have status in the United States,

17   they're green card holders.  His sister is here.  Could it be

18   more?  Of course it could be more, but it's substantial.  And

19   the idea that he would devastate his friends and people that

20   put up houses, there's nothing in his history or record that

21   indicates that he has any kind character that would do that.

22        I know there's a presumption, but the collateral is

23   significant in this case.  And again, he will do whatever

24   conditions the Court imposes on him to encourage a release

25   based on surrendering his passport again.  His family members

1   are willing to surrender their passports to alleviate.  They're

2   willing not to file for renewal of their daughter's U.S.

3   passport which is expired now.  Any condition like that which

4   Mr. Multani signing that.  So if the Court isn't comfortable

5   putting condition on other people, he could just direct

6   Mr. Multani that he could not sign any application for his

7   daughter's renewal without the Court's permission.

8        Any of those conditions -- I think this is -- we could

9   fasten conditions that could alleviate that and protect his

10  right under the Eighth Amendment to be able to get out in this

11  case under reasonable conditions and bond that would alleviate

12  the concerns.

13       Based on that I'll submit it, your Honor.

14            THE COURT:  Thank you, Mr. Sawyer.  So the starting

15  point here is whether -- a couple of foundational principles or

16  starting points, if you will.  One of them is the presumption.

17  Another starting point is that the Court doesn't want to detain

18  anybody if we can come up with a plan for release with which

19  the Court is comfortable.

20       And this is a case in which there are co-defendants.  Those

21  co-defendants are alleged by the government to be higher up the

22  chain in the alleged criminal organization.  Those

23  co-defendants have been released, so we need to think about why

24  defendant's situation might or might not be different.

25       So one very important difference is that the defendant's

1   ties to the United States are much less well-established than

2   the ties of his co-defendants.

3       Another difference, which I also find to be very

4   significant, is that the Court has concerns that have been

5   raised by Pretrial and by the United States about the

6   reliability of defendant's statements.  You know, their

7   responses on perhaps all of these issues, but it's not just one

8   issue, it's not just a few issues, it's a whole bunch of

9   issues -- several issues where it is seemed that the narrative

10   has been shifting here.

11       And that causes the concern -- serious concern on my part

12   of whether, you know, we're at the end of that process.  It's

13   sometimes said that the truth is a gradual process, but we need

14   to know we have the truth, and, you know, it seems that

15   defendant, you know, tells the truth when he knows that it can

16   be verified, but that he's tried to slip a few things past

17   Pretrial and past the government, and that causes me serious

18   concern.  And what do I mean specifically?

19       Well, let's just talk about a few of the issues that might

20   or might not be significant.  First of all, he's acknowledged

21   that there's a significant bond package here more so than there

22   was before, so that's a reality of the situation.  It's a large

23   bond package and would impose serious burdens on his family

24   were he to take the defense point on that.

25       A number of jail calls have been introduced.  I don't find

1    anything in the jail calls specifically that's worrisome.  You

2    know, I think, you know, the government mentioned some

3    concerns, and I understand there are concerns in particular

4    about a call relating to the defendant's daughter.  You know,

5    this is a subject that's likely to provoke a lot of concern on

6    the parents' part.  I'm not -- you know, I find that to be --

7    Mr. Sawyer's explanations to be satisfactory on that ground.

8        I'm not concerned about, you know, what I can see in the

9    jail calls is somewhat hard to understand.  I think we're

10   looking at translations.  It's possible there's something

11   there, but, you know, I'm not concerned about that.

12       I am concerned, however, about the defendant's shifting

13   narrative in terms of his travels to and from the United

14   States, his employment, even though that discrepancy is perhaps

15   relatively minor compared to the others.

16       I have some confusion about -- I feel that the defense may

17   be going a little bit farther than can be justified in

18   declaring the defendant is legally in the United States.  I

19   think perhaps what can be said is that the government has not

20   given us a reason to think that the defendant is not legally

21   residing in the United States, and that's somewhat different.

22   But that's more of a -- that's not an issue that's necessarily

23   rightfully placed on defendant's shoulders.

24       In terms of assets, it does seem that there was a shifting

25   narrative there as well.  You know, it doesn't sound like we're

1   talking about large sums of money demonstrably in defendant's

2   control, but it seems like there was some exaggeration

3   initially in terms of how small the amount of assets he has

4   access to actually was and whether he may have access to or

5   control over or connection to assets that are formerly in his

6   father's name.

7       Those are all issues that have been raised by the

8   government.  To that I'll add that the Court has some concern

9   about shifting narratives about the defendant's criminal

10  history.  I will note that there appear to be no convictions,

11  no ongoing cases, apart from this one, in India or in the

12  United States.  But the initial picture that came to the Court

13  by Pretrial -- was given to Pretrial was relating to one

14  attempted murder charge, trumped up or otherwise.  There,

15  however, appear to have been four, maybe five -- four attempted

16  murders as well as a trespass and attempted assault, and a

17  voluntary causing hurt by dangerous weapon charge.  You know,

18  that's a lot more than one charge.

19      And so, once again, I have a concern that we're dealing

20  here with a shifting narrative, and a narrative that

21  fortunately I cannot put enough stock in to find that the

22  defendant has overcome the presumption.

23      And the presumption applies to both, you know, on its face,

24  the statute applies to both dangerousness and flight risk.  The

25  real issue here, I agree with the government, is focused on

 1    flight risk.  Given the defendant's tenuous -- maybe that's too

 2    strong of a word.  Given his substantially weaker connections

 3    to the United States than his co-defendants, you know, I do

 4    find that flight is much more of a concern with him.  And that,

 5    you know, given the fact that I don't feel I can solidly rely

 6    on the perspective that the defendant is giving us, I can't

 7    really trust that, I can't find he can overcome the presumption

 8    with regard to flight risk.

 9        And so I am going to deny the motion for bail review at

10    this time.  Again, I'll make that finding without prejudice.

11    It's always subject to being reopened, just like today's was.

12        But, you know, I don't find that, unfortunately, there's a

13    pathway to release that I can identify at this time.

14        Mr. Spencer, anything further from the government at this

15    time?

16                 MR. SPENCER:  No, your Honor.  Thank you.

17                 THE COURT:  And I should note I do appreciate the

18    hard work that everybody here has done, including Pretrial

19    Services, Mr. Sawyer, Mr. Multani and his family.  Obviously, a

20    lot of work has gone into trying to put together a situation

21    that would permit release of the defendant.  I would like to

22    find my way there myself, I just don't feel like I can do it

23    this morning.  And I thank you for your work on this issue as

24    well, Mr. Sawyer.

25        Mr. Sawyer, anything further at this time?

1          MR. SAWYER:  No, your Honor.

2          THE COURT:  Okay, thank you all very much.  Stay

3  safe, and have a good rest of the morning.

4          (Proceedings adjourned:  12:00 p.m.)

5                    ---o0o---

6  I certify that the foregoing is a correct transcript from the

7  record of proceedings in the above-entitled matter.

8

9                    /s/ Thresha Spencer
                   THRESHA SPENCER
10                  CSR No. 11788, RPR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25