~~PHILLIP A. TALBERT~~ ERIC GRANT
United States Attorney
DAVID W. SPENCER
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>PARAMPREET SINGH,<br><br>　　　　　Defendant. | CASE NO. 2:21-CR-0078-JAM<br><br>PLEA AGREEMENT |

## I.　INTRODUCTION

### A.　Scope of Agreement

The Indictment in this case charges the defendant with violations of 21 U.S.C. §§ 846 and 841(a)(1) – conspiracy to distribute and to possess with intent to distribute cocaine, heroin, opium, and ketamine ("Count One") and 21 U.S.C. § 841(a)(1) – distribution of cocaine ("Count Two"). This document contains the complete plea agreement between the United States Attorney's Office for the Eastern District of California (the "government") and the defendant regarding this case. This plea agreement is limited to the United States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

### B.　Court Not a Party

The Court is not a party to this plea agreement. Sentencing is a matter solely within the discretion of the Court, and the Court may take into consideration any and all facts and circumstances

PLEA AGREEMENT　　　　　　　　　　　　　1

concerning the criminal activities of defendant, including activities that may not have been charged in the Indictment. The Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to and including the statutory maximum stated in this plea agreement.

If the Court should impose any sentence up to the maximum established by the statute, the defendant cannot, for that reason alone, withdraw his guilty plea, and he will remain bound to fulfill all of the obligations under this plea agreement. The defendant understands that neither the prosecutor, defense counsel, nor the Court can make a binding prediction or promise regarding the sentence he will receive.

## II.   DEFENDANT'S OBLIGATIONS

### A.   Guilty Plea

The defendant will plead guilty to Count One, charging him with conspiracy to distribute and to possess with intent to distribute cocaine, heroin, opium, and ketamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1). The defendant agrees that he is in fact guilty of this charge and that the facts set forth in the Factual Basis For Plea attached hereto as Exhibit A are accurate.

The defendant agrees that this plea agreement will be filed with the Court and become a part of the record of the case. The defendant understands and agrees that he will not be allowed to withdraw his plea should the Court not follow the government's sentencing recommendations.

The defendant agrees that the statements made by him in signing this Agreement, including the factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by the United States in any subsequent criminal or civil proceedings. The defendant waives any rights under Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence, to the extent that these rules are inconsistent with this paragraph or with this Agreement generally.

### B.   Sentencing Recommendation

The defendant and his counsel may recommend whatever sentence they deem appropriate.

### C. Special Assessment

The defendant agrees to pay a special assessment of $100 at the time of sentencing by delivering a check or money order payable to the United States District Court to the United States Probation Office immediately before the sentencing hearing. The defendant understands that this plea agreement is voidable at the option of the government if he fails to pay the assessment prior to that hearing. If the defendant is unable to pay the special assessment at the time of sentencing, he agrees to earn the money to pay the assessment, if necessary by participating in the Inmate Financial Responsibility Program.

### D. Defendant's Violation of Plea Agreement or Withdrawal of Plea

If the defendant, violates this plea agreement in any way, withdraws his plea, or tries to withdraw his plea, this plea agreement is voidable at the option of the government. The government will no longer be bound by its representations to the defendant concerning the limits on criminal prosecution and sentencing as set forth herein. One way a defendant violates the plea agreement is to commit any crime or provide any statement or testimony which proves to be knowingly false, misleading, or materially incomplete. Any post-plea conduct by a defendant constituting obstruction of justice will also be a violation of the agreement. The determination whether the defendant has violated the plea agreement shall be decided under a probable cause standard.

If the defendant violates the plea agreement, withdraws his plea, or tries to withdraw his plea, the government shall have the right: (1) to prosecute the defendant on any of the counts to which he pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this plea agreement; and (3) to file any new charges that would otherwise be barred by this plea agreement. The defendant shall thereafter be subject to prosecution for any federal criminal violation of which the government has knowledge, including perjury, false statements, and obstruction of justice. The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office.

By signing this plea agreement, the defendant agrees to waive any objections, motions, and defenses that the defendant might have to the government's decision to exercise the options stated in the previous paragraph. Any prosecutions that are not time-barred by the applicable statute of limitations as of the date of this plea agreement may be commenced in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement

and the commencement of any such prosecutions. The defendant agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-barred as of the date of this plea agreement.

In addition: (1) all statements made by the defendant to the government or other designated law enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal, whether before or after this plea agreement, shall be admissible in evidence in any criminal, civil, or administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by the defendant before or after this plea agreement, or any leads derived therefrom, should be suppressed. By signing this plea agreement, the defendant waives any and all rights in the foregoing respects.

### E. Forfeiture

The defendant agrees to forfeit to the United States voluntarily and immediately all of his right, title, and interest to any and all assets subject to forfeiture pursuant to 21 U.S.C. § 853(a) and Fed. R. Crim. P. 32.2(b)(1). Those assets include, but are not limited to, the following:

1. A personal forfeiture money judgment in the amount of $2,000,000.00.

The defendant agrees that the listed asset represents proceeds traceable to violations of 21 U.S.C. §§ 846 and 841(a)(1).

Payment of the personal forfeiture money judgment should be made in the form of a cashier's check made payable to the U.S. Marshals Service to the U.S. Attorney's Office, Attn: Asset Forfeiture Unit, 501 I Street, Suite 10-100, Sacramento, CA 95814. Payment is due within 30 days of sentencing. Prior to the imposition of sentence, any funds delivered to the United States to satisfy the personal money judgment shall be seized and held by the U.S. Marshals Service, in its secure custody and control.

The defendant agrees to fully assist the government in the forfeiture of the listed asset and to take whatever steps are necessary to pass clear title to the United States. The defendant shall not sell, transfer, convey, or otherwise dispose of any of his assets.

The defendant waives oral pronouncement of forfeiture at the time of sentencing and any defects in such pronouncement that pertain to forfeiture, and waives any defenses to forfeiture, including any defense predicated on the Ex Post Facto, Double Jeopardy, and Excessive Fines Clauses of the United States Constitution. The defendant knowingly and voluntarily waives any right to jury trial in any criminal or civil forfeiture proceeding.

### III.   THE GOVERNMENT'S OBLIGATIONS

#### A.   Dismissals

The government agrees to move, at the time of sentencing, to dismiss without prejudice the remaining count in the pending Indictment. The government also agrees not to reinstate any dismissed count except if this agreement is voided as set forth herein, or as provided in II.D (Defendant's Violation of Plea Agreement), and VII.B (Waiver of Appeal) herein.

#### B.   Recommendations

##### 1.   Incarceration Range

The government will recommend that the defendant be sentenced to the low end of the applicable guideline range for his offense, including the application of the mandatory statutory minimum term, as determined by the Court. The government may recommend whatever it deems appropriate as to all other aspects of sentencing.

##### 2.   Acceptance of Responsibility

The government will recommend a two-level reduction (if the offense level is less than 16) or a three-level reduction (if the offense level reaches 16) in the computation of defendant's offense level if he clearly demonstrates acceptance of responsibility for his conduct as defined in U.S.S.G. § 3E1.1. This includes the defendant meeting with and assisting the probation officer in the preparation of the pre-sentence report, being truthful and candid with the probation officer, and not otherwise engaging in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either in the preparation of the pre-sentence report or during the sentencing proceeding.

#### C.   Use of Information for Sentencing

The government is free to provide full and accurate information to the Court and the United States Probation Office ("Probation"), including answering any inquiries made by the Court and/or

Probation, and rebutting any inaccurate statements or arguments by the defendant, his attorney, Probation, or the Court. The defendant also understands and agrees that nothing in this Plea Agreement bars the government from defending on appeal or collateral review any sentence that the Court may impose.

### IV.    ELEMENTS OF THE OFFENSE

At a trial, the government would have to prove beyond a reasonable doubt the following elements of the offense to which the defendant is pleading guilty, conspiracy to distribute and to possess with intent to distribute at least five kilograms of a mixture and substance containing cocaine, at least one kilogram of a mixture and substance containing heroin, opium, and ketamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1):

1. Beginning on a date unknown, but not later than August 25, 2020, and continuing through April 8, 2021, there was an agreement between two or more persons to distribute and possess with intent to distribute at least five kilograms of a mixture and substance containing cocaine, at least one kilogram of a mixture and substance containing heroin, opium, and ketamine; and

2. The defendant joined in the agreement knowing of its purpose and intending to help accomplish that purpose.

The defendant fully understands the nature and elements of the crime charged in the Indictment to which he is pleading guilty, together with the possible defenses thereto, and has discussed them with his attorney.

### V.    MAXIMUM SENTENCE

**A.    Maximum Penalty**

The maximum sentence that the Court can impose is life in prison, a fine of $10,000,000, a term of supervised release of at least five years and up to life, and a special assessment of $100. The charge to which defendant is pleading guilty carries a ten-year mandatory minimum sentence, absent a motion by the government for reduction pursuant to 18 U.S.C. § 3553(e). In addition, the defendant may be ineligible for certain federal and/or state assistance and/or benefits, pursuant to 21 U.S.C. § 862.

### B.   Violations of Supervised Release

The defendant understands that if he violates a condition of supervised release at any time during the term of supervised release, the Court may revoke the term of supervised release and require the defendant to serve up to five years of additional imprisonment.

## VI.   SENTENCING DETERMINATION

### A.   Statutory Authority

The defendant understands that the Court must consult the Federal Sentencing Guidelines and must take them into account when determining a final sentence. The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines and must take them into account when determining a final sentence. The defendant further understands that the Court will consider whether there is a basis for departure from the guideline sentencing range (either above or below the guideline sentencing range) because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. The defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

### B.   Sentencing Guideline Stipulations

#### 1.   Base Offense Level

The parties stipulate and agree to recommend a base offense level of 30 based on the amounts of drugs seized, as described in the Factual Basis for Plea. *See* U.S.S.G. § 2D1.1(c)(5) (base offense level of 30 for at least 1,000 KG but less than 3,000 KG of converted drug weight). The parties stipulate and agree that this calculation of the base offense level is appropriate based on the unique facts of this particular case.

#### 2.   Role in the Offense Adjustment

The parties stipulate and agree that the defendant was an organizer and leader of criminal activity that involved five or more participants and was otherwise extensive. U.S.S.G. § 3B1.1(a). The parties further stipulate and agree that defendant's role in the offense as a leader and organizer means that an

increase of 4 levels in his offense level pursuant to U.S.S.G. § 3B1.1 is appropriate under these unique facts and the defendant's specific role in the offense conduct.

## VII. WAIVERS

### A. Waiver of Constitutional Rights

The defendant understands that by pleading guilty he is waiving the following constitutional rights: (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, constitutional challenges to the statutes of conviction, and other pretrial motions that have been filed or could be filed; (e) to subpoena witnesses to testify on his behalf; (f) to confront and cross-examine witnesses against him; and (g) not to be compelled to incriminate himself.

### B. Waiver of Appeal and Collateral Attack

The defendant understands that the law gives the defendant a right to appeal his guilty plea, conviction, and sentence. The defendant agrees as part of his plea, however, to give up the right to appeal any aspect of the guilty plea, conviction, or the sentence imposed in this case. The defendant understands that this waiver includes, but is not limited to, any and all constitutional and/or legal challenges to the defendant's conviction and guilty plea, including arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts attached to this agreement is insufficient to support the defendant's plea of guilty.

Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the statutory maximum; and/or (2) the government appeals the sentence in the case. The defendant understands that these two circumstances occur infrequently and that in all other cases this Agreement constitutes a complete waiver of all appellate rights.

In addition, regardless of the sentence the defendant receives, the defendant also gives up any right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any aspect of the guilty plea, conviction, or sentence imposed in this case.

Notwithstanding the agreement in paragraph III.A (Dismissals) above that the government will move to dismiss counts against the defendant, if the defendant ever attempts to vacate his plea, dismiss the underlying charges, or modify or set aside his sentence on any of the counts to which he is pleading guilty, the government shall have the rights set forth in paragraph II.D (Defendant's Violation of Plea Agreement) herein.

## VIII. ENTIRE PLEA AGREEMENT

Other than this plea agreement, no agreement, understanding, promise, or condition between the government and the defendant exists, nor will such agreement, understanding, promise, or condition exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and counsel for the United States.

## IX. APPROVALS AND SIGNATURES

### A. Defense Counsel

I have read this plea agreement and have discussed it fully with my client. The plea agreement accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to plead guilty as set forth in this plea agreement.

Dated: __August 26 2025__         __Brian Getz__
                                  ~~DAVID A. TORRES~~
                                  Counsel for Defendant

### B. Defendant

I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to me, other than those contained in this plea

agreement. In addition, no one has threatened or forced me in any way to enter into this plea agreement. Finally, I am satisfied with the representation of my attorney in this case.

Dated: Aug 26, 2025

*[signature]*
PARAMPREET SINGH, Defendant

### C. Attorney for the United States

I accept and agree to this plea agreement on behalf of the government.

Dated: Aug 26, 2025

~~PHILLIP A. TALBERT~~ ERIC GRANT
United States Attorney

By: *[signature]*
DAVID W. SPENCER
Assistant United States Attorney

# EXHIBIT A

## Factual Basis for Plea

If this matter proceeded to trial, the United States would establish the following facts beyond a reasonable doubt:

Defendant Parampreet SINGH admits that, beginning no later than August 25, 2020, and continuing through April 8, 2021, there was an agreement between him, his charged co-conspirators, Ranvir SINGH and Amandeep MULTANI, and others, to distribute and possess with intent to distribute: (a) at least 5 kilograms of a mixture and substance containing cocaine, (b) at least one kilogram of a mixture and substance containing heroin, (c) opium, and (d) ketamine. Parampreet SINGH joined in this agreement knowing of its purpose and intending to help accomplish that purpose.

As part of this agreement, Parampreet SINGH and his co-conspirators coordinated multiple cocaine, heroin, opium, and ketamine deals in Canada. Parampreet SINGH and co-defendants Ranvir SINGH and MULTANI coordinated these deals from California over encrypted cell phone applications (WhatsApp and BOTIM). In total, between October 2020 and April 2021, they coordinated sales to undercover officers of approximately 10 kilograms ("KG") of cocaine, 1.5 KG of opium, 3 KG of ketamine, and multiple samples of heroin, for a total of $662,600 in Canadian dollars ("CAD") and $75,190 in U.S. dollars ("USD"), in ten deals in the area of Toronto, Canada, three deals in the area of Vancouver, Canada, and one deal in Sacramento, California. (The co-defendants did not receive $265,000 CAD of these negotiated sale prices because law enforcement seized 5 KG of cocaine on April 7, 2021 before the agreed-upon deal could occur, as detailed below.) In addition, Parampreet SINGH and his co-defendants offered to sell up to 100 KG of cocaine, up to 25 KG of heroin, up to 100 KG of opium, and up to 200 KG of ketamine on numerous occasions between September 2020 and April 2021.

Specifically, Parampreet SINGH and his co-conspirators committed the following acts:

### *A Canadian Undercover Officer (UC-1) Is Introduced to Parampreet SINGH and SINGH Offers up to 50 KG of Cocaine, 25 KG of Heroin, and 30 KG of Opium*

On June 2, 2020, a Canadian undercover officer ("UC-1") met Parshotem Malhi in Brampton, Canada (a suburb of Toronto) to obtain a sample of heroin. Malhi also quoted a price of $60,000 CAD per KG of cocaine. Malhi told UC-1 that Parampreet SINGH was his drug link in California and that they had worked together in the past smuggling loads of drugs across the U.S.-Canada border in trucks that also contained legitimate cargo. Malhi advised that Parampreet SINGH and his associates had cocaine ready for purchase and pick-up in the United States.

On August 23, 2020, Malhi told UC-1 that Parampreet SINGH had authorized Malhi to give his number to UC-1. A couple days later, Parampreet SINGH made contact with UC-1 over WhatsApp. They discussed UC-1's buyers being interested in a purchase, and Parampreet SINGH said he would call UC-1 back later about the "stuff" UC-1 wanted to purchase. On September 20, 2020, Parampreet SINGH advised UC-1 that he had about 25-30 KG of opium arriving in Vancouver soon and they discussed potential prices. In multiple calls in early October 2020, UC-1 and Parampreet SINGH discussed Parampreet SINGH supplying up to 50 KG of cocaine. Parampreet SINGH also said that he had 25 KG of heroin for sale. During these early calls, Parampreet SINGH instructed UC-1 to contact him using encrypted applications BOTIM and WhatsApp, admonished UC-1 not to talk openly on the phone (when UC-1 used the word "chittah" to refer to cocaine), and told UC-1 on multiple occasions

that he should not be transporting loads or touching the product himself but should be making money through phone calls.

### *Parampreet SINGH and Ranvir SINGH Coordinate 1 KG Sales of Ketamine in October and November 2020 While Offering 100-200 KG of Ketamine*

In mid-October, Parampreet SINGH informed UC-1 he had a seller in Toronto with 200 KG of ketamine and said he needed to get rid of at least 100 KG. They agreed to start with a 1 KG sample buy. Parampreet SINGH then introduced Ranvir SINGH to UC-1 to coordinate the details of the transaction, in a phone call over the BOTIM application.

On October 21, 2020, UC-1 purchased about 1 KG of ketamine in Brampton, Canada, from "Gary" (later identified as Gurbinder Sooch), for $23,000 USD and $8,100 CAD, in a deal arranged by Parampreet SINGH and Ranvir SINGH. During the deal, Parampreet SINGH was on the phone and instructed Sooch to pay UC-1 $2,000 from the buy money, which Sooch did. Lab testing confirmed the substance was ketamine. The next day, UC-1 and Parampreet SINGH discussed the deal, Parampreet SINGH told UC-1 that UC-1 needed to purchase another 4 KG soon to show UC-1 was a serious buyer.

Leading up to November 13, 2020, UC-1 had multiple recorded conversations over BOTIM and WhatsApp with both Parampreet SINGH and Ranvir SINGH (including one with both of them while they were together) in which they discussed the specifics of another 1 KG ketamine deal. The basic arrangement was that UC-1's buyers were supposed to be buying a total of 5 KG of ketamine quickly, to show they were serious about a bigger deal. UC-1 also continued to inform Parampreet SINGH during these communications that his buyer wanted cocaine and Parampreet SINGH assured UC-1 he would arrange to provide cocaine. He told UC-1 there was a lot of cocaine in his area (California) and that he would receive payment and then send a driver to deliver the cocaine to Canada.

On November 13, 2020, UC-1 purchased another 1 KG of ketamine in Brampton, Canada, for $33,000 CAD, from Harjinder "Pindi" Jhaj, for $33,000 CAD ($20,000 at the deal, $13,000 paid five days later), in another deal arranged by Parampreet SINGH and Ranvir SINGH in communications over encrypted applications. Lab testing confirmed the substance was ketamine.

### *Parampreet SINGH Introduces MULTANI to UC-1 on December 3, 2020, and MULTANI Coordinates Deals for 1 KG of Purported Ketamine on December 3 and December 9 on Behalf of Parampreet SINGH*

On December 3, 2020, Parampreet SINGH told UC-1 that "his guy" would call UC-1 to arrange the details of another 1 KG ketamine deal. A couple minutes later, MULTANI called UC-1 via WhatsApp. Over multiple WhatsApp calls that day, MULTANI coordinated the drug deal for that evening in Brampton, Canada. MULTANI refused to give UC-1 the phone number of his driver, saying he (MULTANI) would be the one in contact with UC-1 at all times. MULTANI said he was arranging the deal in this way because it was the first meeting and he wanted to do everything safely. MULTANI said he was very close to Parampreet SINGH and "his heartbeat is mine." MULTANI told UC-1 the driver who would meet UC-1 must say the code word "Khalistan" upon meeting. MULTANI then gave UC-1 the description of a vehicle in the parking lot, UC-1 approached the driver, Lakhpreet Brar, and Brar said the code word "Khalistan." Brar then took $33,000 CAD from UC-1 and returned a little while later with about 1 KG of purported ketamine. Lab testing revealed the purported ketamine in fact contained *Diphenhydramine*, a non-controlled substance that is an active ingredient in Benadryl.

PLEA AGREEMENT         A-2

On December 8, 2020, Parampreet SINGH advised UC-1 to contact MULTANI. Minutes later, MULTANI called UC-1 via WhatsApp. MULTANI said UC-1 would meet the same guy as the previous deal and they coordinated a 1 KG ketamine deal for the next day. MULTANI also said Parampreet SINGH told him what UC-1 was looking for (i.e., cocaine) and that he would get UC-1 good pricing for both cocaine and heroin. Leading up to the deal, MULTANI told UC-1 he knew from Parampreet SINGH that UC-1 was looking for cocaine and that he would get UC-1 good pricing for both cocaine and heroin.

On December 9, 2020, Parampreet SINGH told UC-1 that MULTANI was the guy who connects people from India, Afghanistan, Germany, the United States and Canada and UC-1 should keep him happy. Parampreet SINGH further stated that he had 100 kilograms of opium available in the Toronto area. Later that day, UC-1 engaged in extensive communications with MULTANI regarding the ketamine deal. MULTANI also said his driver would provide a sample of something (heroin) that UC-1 had discussed with Parampreet SINGH.

On the night of December 9, 2020, at MULTANI's direction, UC-1 met MULTANI's driver, again Lakhreet Brar, and purchased 1 KG of purported ketamine from him for $33,000 CAD. Brar also provided a sample of heroin, as MULTANI had said he would. Lab testing revealed the purported ketamine in fact contained *Diphenhydramine* and confirmed the heroin sample to be heroin.

About a week after the deal, Parampreet SINGH asked if UC-1 had provided the sample of heroin to any buyers yet. Parampreet SINGH also asked how much they had made off the ketamine deals and UC-1 said $17,000. Parampreet SINGH directed UC-1 to keep $10,000 and send $7,000 to him.

### *MULTANI Gives UC-1 Pricing for KGs of Heroin in Toronto and Vancouver and Discusses shipping Cocaine Into Canada from the United States Using Teams of Drivers*

On December 18, MULTANI told UC-1 heroin was available and UC-1 asked for prices. MULTANI quoted $50,000 - $55,000 CAD per KG of medium quality heroin (same as the sample he provided to UC-1) and $65,000-$70,000 CAD per KG of high-quality heroin. In a subsequent call, MULTANI said the price was $55,000 for medium quality heroin. In another call in December 21, MULTANI told UC-1 he'd try to get that price down to $47,000 per KG. MULTANI said he had explained to Parampreet SINGH that they were forging a long-term relationship between the heroin seller and UC-1's buyer, brokered by UC-1, MULTANI and Parampreet SINGH. During this call, MULTANI also discussed shipping cocaine to Canada using his drivers and MULTANI said he had teams of drivers in both Texas and the Los Angeles area. MULTANI promised to get back to UC-1 with cocaine pricing, saying he needed to speak with the drivers as there was fluctuation in the drivers' system and the drivers' fees were built into the price.

In another call on December 22, 2020, MULTANI discussed heroin prices at length again. He said he had negotiated the medium quality price down to $48,000 per KG but that there was a shortage of high-quality heroin and he was coordinating with suppliers (which UC-1 understood be either in Pakistan or Afghanistan) to obtain more. In a subsequent call that day, MULTANI said he had "pure form" heroin available in Vancouver, even better than the high quality previously discussed, for an estimated $75,000 to $77,000 CAD per KG.

PLEA AGREEMENT         A-3

*Parampreet SINGH Directs Further Ketamine Purchases and Tells UC-1 He Has Arranged Delivery of 100-200 KG of Cocaine to Canada*

On December 23, 2020, Parampreet SINGH and UC-1 spoke about whether UC-1 wanted to purchase more ketamine. UC-1 expressed concerns about the previous purchases because of the quality of the product. Parampreet SINGH advised UC-1 that he would secure a new price of $25,000 per KG of ketamine. Parampreet SINGH instructed UC-1 to continue working with Ranvir SINGH and "Gary" Sooch on ketamine purchases. During this call, Parampreet SINGH also stated that he had arranged for 100 to 200 KG of cocaine to be delivered to Canada from California. Parampreet SINGH stated they were $39,000 per KG.

*Parampreet SINGH Coordinates a 1 KG Ketamine Deal in Canada on December 29, 2020*

On December 23, Parampreet SINGH told UC-1 to contact "Gary" Sooch to arrange to pick up ketamine for $25,000 per KG to compensate UC-1's "buyers," who were not happy. On December 29, Parampreet SINGH told UC-1 to pick up 3 KGs of ketamine, pay $25,000 for one, and pay for the remainder later. UC-1 then made arrangements to purchase the ketamine from Sooch, but arranged to pick up only the one KG UC-1 was paying for at the deal.

On December 29, 2020, UC-1 purchased approximately 1 KG of ketamine for $25,000 CAD in Toronto, Canada, from Sooch. Lab testing in Canada confirmed the substance was ketamine.

*MULTANI Coordinates Deals for 1.5 KG of Opium on January 7, 2021*

On December 25, 2020, MULTANI told UC-1 he also had opium available for $22,000 CAD per KG. He said there were 80-100 KG available and that "we can rule the market" for opium.

On January 7, 2021, UC-1 contacted MULTANI about obtaining opium, as well as heroin, cocaine, and ketamine. After multiple calls and texts via WhatsApp, MULTANI agreed to $21,000 for 1 KG of opium. Later, MULTANI advised the packages were split into 300 grams each and said he would send three (900 grams total). UC-1 said that in light of this, he would pay $20,000 and they would do price adjusting after. During these discussions, MULTANI sent UC-1 a video of someone opening packages of opium. The packages in the video matched those that were delivered later that night. MULTANI coordinated the details of the meeting with UC-1 and advised that the same driver from the December 3 and 9 ketamine deals (Lakhpreet Brar) would deliver the opium. As MULTANI stated, Brar arrived and met with UC-1 in Brampton, Canada, and sold UC-1 900 grams of opium for $20,000. Lab testing confirmed the substance was opium.

Minutes after the purchase of the 900 grams of opium, UC-1 called MULTANI and requested an additional half KG. MULTANI said he could make it available and it would be 600 grams. They agreed on a price of $11,500. The same driver (Lakhpreet Brar) returned about 20 minutes after the call and sold UC-1 two 300-gram packages (600 grams total) of opium for $11,500. The packages appeared the same as the previous packages and those in the video from MULTANI.

On January 20, 2021, UC-1 informed MULTANI that UC-1 had distributed the 300 gram opium pieces as "samples" and he told his buyers not to order more until they were ready for at least 10 KG. MULTANI responded that opium is very common now in Canada and that he had lowered the pricing to $20,000 per KG. In another call three days later, MULTANI reiterated this and discussed different types and qualities of opium.

***MULTANI Coordinates 1 KG Sample Cocaine Deal on January 27, 2021 and Offers 25 KG of Cocaine Shortly After the Deal on Behalf of Parampreet SINGH***

On January 7, 2021, MULTANI told UC-1 he could sell cocaine for $60,000 CAD per KG in Toronto and/or Vancouver. On January 20, 2021, MULTANI told UC-1 that he would charge a minimum of $60,000 CAD per KG of cocaine and that he had spoken with Parampreet SINGH, who had approved of this pricing. MULTANI said he was going to meet with an associate (in California) who was receiving a load in the next couple days and then would send "one or two" KGs with his driver to the Toronto area for UC-1 as a sample. On January 23, 2021, MULTANI said he would send the cocaine exactly as he received it and would prove it was coming from the United States, and even Mexico. He said the package would take a few days to reach UC-1. Later that day, MULTANI said he would arrange to have the cocaine delivered to his "office" in Etobicoke (a suburb of Toronto). They also agreed to safety mechanisms for the deal: MULTANI would send UC-1 a photo of the stamp on the cocaine. UC-1 would send the money in a package with a barcode, and MULTANI would have to send UC-1 a photo with the barcode upon receipt of the money.

On January 26, 2021, MULTANI sent UC-1 a photo of a brick of cocaine stamped "#10" as well as a color reaction test that showed a very high purity. (This photo of the cocaine matched the cocaine that was delivered the next day.) They then discussed details for the deal the next day. MULTANI also told UC-1 that Parampreet SINGH was involved in this as well and they would be working long term. He told UC-1 to check the product and tell Parampreet SINGH if it was not good.

On January 27, 2021, UC-1 spoke with both MULTANI and Parampreet SINGH in separate calls over encrypted apps. Both confirmed the deal was happening later that day. MULTANI arranged the details with UC-1; Parampreet SINGH assured UC-1 he could and should trust MULTANI, despite MULTANI's insisting that the money be provided upfront, before the cocaine arrived.

Later on January 27, 2021, in a meeting in Brampton, Canada coordinated by MULTANI, UC-1 met with MULTANI's co-conspirator Sukhvir Singh and UC-1 provided Singh $60,000 CAD for the cocaine. Singh was the passenger in a vehicle driven by Simranjeet Narang, who was also the driver to the 900 gram opium sale on January 7, 2021. About 30 minutes later, while MULTANI remained in contact with UC-1, Narang and the passenger returned and delivered 1 KG of cocaine to UC-1. Lab testing confirmed the substance was cocaine with 73% purity.

The next day, on January 28, 2021, Parampreet SINGH asked UC-1 for a report on the deal and how much UC-1 had sold the cocaine for. UC-1 said $70,000 CAD, and that they each made $5,000 CAD. Parampreet SINGH vouched for MULTANI and said that if UC-1 continued, MULTANI would provide more work (cocaine), up to 30 kilograms.

On January 29, 2021, MULTANI told UC-1 the cocaine in Toronto was still available, that the supplier had 25 KG and was stocking up a little at a time. MULTANI confirmed that he could fill an order of 25 KG for UC-1. In another call later that day, they discussed the quality of the cocaine and whether any higher quality cocaine could be obtained. In a third call that day, MULTANI described packaging for the cocaine he sent that matched what UC-1 received. MULTANI said the bricks were packaged 5 at a time (i.e., 5 KGs at a time) when he sent it to Canada.

On January 30, 2021, UC-1 told Parampreet SINGH about concerns with quality some of the buyers had raised. Parampreet SINGH responded not to listen to too many people and that it was high quality cocaine.

***Parampreet SINGH and MULTANI Meet UC-2 in Sacramento on February 3, 2021 and UC-2 Pays $6,300 in Broker's Fees for Deals MULTANI Brokered in Canada***

UC-1 arranged for the delivery of $6,300 USD to Parampreet SINGH in Sacramento, California, on February 3, 2021, as partial payment for approximately 2 kilograms of ketamine and 1.5 kilograms of opium previously purchased in Canada on November 8, 2020 (ketamine), December 9, 2020 (purported ketamine), and January 7, 2021 (opium). Another undercover officer ("UC-2") delivered the broker's fee to Parampreet SINGH on behalf of UC-1. MULTANI drove Parampreet SINGH to the meeting and accompanied him throughout. Along with the payment of the broker's fee, UC-2 also provided a Toronto Raptors jersey to Parampreet SINGH as a gift. The jersey was later found at Parampreet SINGH's residence in Davis during the execution of a search warrant on April 8, 2021.

***MULTANI Coordinates Another 1 KG Sample Cocaine Deal on February 12, 2021, on Behalf of Parampreet SINGH***

On February 11, 2021, UC-1 deployed to purchase 1 KG of cocaine, brokered by MULTANI, but MULTANI cancelled at the last minute, saying the product would be crossing the border and arriving later that night. Shortly thereafter, UC-1 called Parampreet SINGH and complained about MULTANI, and Parampreet SINGH said he would call him.

Later on February 11, 2021, UC-1 and MULTANI agreed to conduct the deal the next day, in Brampton, Canada, for the previously agreed upon price of $60,000 CAD. MULTANI negotiated and then coordinated the deal from California through WhatsApp calls and texts.

On February 12, 2021, with MULTANI directing, UC-1 purchased 1 KG cocaine for $60,000 CAD from Simranjeet Narang, the driver for the January 27, 2021 cocaine deal and one of the January 7, 2021 opium deals. Lab testing confirmed the substance was cocaine with 73% purity. After the deal, UC-1 told MULTANI the cocaine looked similar to from the previous deal and to work on obtaining a higher quality product.

***MULTANI Coordinates a Deal for a Sample of Cocaine and Heroin in Vancouver, Canada and Offers to Supply up to 100 KG of Cocaine Per Month on Behalf of Parampreet SINGH***

On January 6, 2020, MULTANI told UC-1 during a WhatsApp call that he had secured pricing for cocaine in Vancouver of $60,000 CAD per KG. MULTANI said he would have a sample made ready for UC-1. On January 14, 2021, UC-1 told Parampreet SINGH that UC-1 was working with MULTANI to make a connection in Vancouver. Parampreet SINGH responded that he had spoken with MULTANI and encouraged UC-1 to continue working with MULTANI on Vancouver. Parampreet SINGH also vouched for the suppliers in Vancouver, saying they were MULTANI's friends. After UC-1 quoted cocaine prices of $65,000 CAD per KG in both Toronto and Vancouver, Parampreet SINGH said he would work on lowering the price of cocaine. In another BOTIM call five days later (January 19), UC-1 told Parampreet SINGH that samples (of cocaine and heroin) that were supposed to be picked

up in Vancouver had fallen through. Parampreet SINGH said he heard the suppliers had to cancel because someone's relative was killed in India. He said the suppliers were "gangsters."

Over the next couple weeks, UC-1 and MULTANI communicated multiple times regarding updates on UC-1's associates obtaining samples of cocaine and heroin. On January 29, 2021, MULTANI quoted pricing of $65,000 CAD per KG of heroin, which he called "pure form."

Eventually, UC-1 passed a number to MULTANI for a buyer of his in the Vancouver area, who was in fact an undercover officer ("UC-3"). MULTANI called UC-3 on February 5, 2021, using WhatsApp, and they agreed to arrange a day the following week for UC-3 to obtain a sample from MULTANI. In another call with UC-3 on February 8, 2021, MULTANI agreed to provide a one ounce sample of cocaine and said he could provide the "other stuff" too (i.e. heroin). When asked what he could deliver on a monthly basis, MULTANI said he could do 100 KG per month. He said he could do 10, 20, 30, 40, 50, and the quantity was not the issue but the timing. He said he needs a day's notice. In WhatsApp calls the following two days, they agreed to meet on February 11, 2021, and for UC-3 to obtain a one ounce sample of cocaine for $2,000 CAD with $500 off the next order.

On February 11, 2021, UC-3, as directed by MULTANI, UC-3 met with two of MULTANI's co-conspirators, Sukhvir Singh (who delivered cocaine in Brampton on January 27) and Maninder Dhaliwal, in the Vancouver area. Singh and Dhaliwal sold UC-3 one ounce of cocaine for $2,000 CAD and gave UC-3 a sample of heroin. Lab testing confirmed the cocaine was cocaine with 87% purity and the heroin was heroin with 24% purity.

On February 26, 2021, UC-1 told Parampreet SINGH that UC-1 had plugged MULTANI into some buyers in Vancouver. Parampreet SINGH responded that he knew.

***MULTANI Coordinates a Deal for 2 KG of Cocaine in Vancouver on March 6, 2021, on Behalf of Parampreet SINGH, and Says He is Filling Orders for Other Customers of up to 10 KG of Cocaine at a Time in Vancouver***

From February 16-22, UC-3 and MULTANI exchanged many WhatsApp messages negotiating the pricing for an order of 10 KG cocaine; eventually MULTANI agreed to sell UC-3 2 KG for $56,000 CAD per KG. On February 27, 2021, MULTANI told UC-1 that his sales in Vancouver were going well and he was filling orders of 8-10 KGs and in other cases 3-4 KGs. They then discussed cocaine pricing and purity.

On March 4, 2021, MULTANI told UC-1 that UC-1's Vancouver contact would be picking up 2 KG of cocaine for $56,000 to $58,000 CAD each. MULTANI said that Parampreet SINGH spoke to the quality of the cocaine being in the high 90% and there was a large quantity available. Minutes later, UC-1 spoke with Parampreet SINGH, and told him that MULTANI was selling 2 KGs of cocaine to UC-1's contacts in Vancouver. Parampreet SINGH responded that they could "pick it up from here" (i.e. order from Parampreet SINGH in Sacramento).

On March 6, 2021, as coordinated with MULTANI, UC-3 met with Sukhvir Singh and Maninder Dhaliwal in a Home Depot parking lot in Coquitlam, a suburb of Vancouver, where UC-3 purchased 2 KG of cocaine from Singh and Dhaliwal for $112,000 CAD. Lab testing confirmed each KG brick was cocaine; one was 91% purity and the other was 94%.

On March 8, 2021, Parampreet SINGH mentioned to UC-1 that he knew about the 2 KG that were sold in Vancouver and asked UC-1 about paying a broker fee to him and MULTANI. UC-1 advised Parampreet SINGH to speak with MULTANI since he had provided the introduction. Parampreet SINGH said once he and UC-1 acquired 50 KG of cocaine, trust would be built with the supplier and other people would be coming to them for cocaine.

***On March 11, 2021, UC-2 Purchases 1 KG of Cocaine from Parampreet SINGH, Ranvir SINGH, and MULTANI in Sacramento and Pays Them Broker's Fees for Canada Cocaine Purchases***

On February 19, 2021, after the second 1 KG cocaine deal in Brampton, Canada, UC-1 told Parampreet SINGH that the buyers were not liking the cocaine and that he was looking for higher quality cocaine from the United States. Parampreet SINGH said he would take care of it and discussed meeting a supplier in the L.A. area. On February 25, 2021, Parampreet SINGH told UC-1 that after the first KG of cocaine was cleared, it would be non-stop, and his guy (supplier) could do 100 KG. UC-1 said he would have his guy (UC-2) pick it up. On March 4, 2021, MULTANI called UC-1 via WhatsApp and said Parampreet SINGH had tasked him with picking up the money that UC-1 was sending to California to pay off the prior cocaine transactions in Canada (the January 27 and February 12 deals) and the new KG UC-2 would be purchasing. On March 8, 2021, UC-1 confirmed to Parampreet SINGH that his guy (UC-2) would be delivering the money for the one KG "sample" as well as $7,500 CAD owed for the prior cocaine transactions in Canada. UC-1 said that after the sample deal there would be more to follow.

On March 9, 2021, UC-1 spoke to both Parampreet SINGH and then MULTANI during a BOTIM call on Parampreet SINGH's phone, as they were both together. They coordinated logistics for the deal to occur two days later. Parampreet SINGH said he and MULTANI would coordinate the deal with UC-1 and UC-1 should not share their phone numbers with anyone. MULTANI also said the supplier had a large quantity of cocaine available. On March 10, 2021, UC-1 spoke with MULTANI over WhatsApp. UC-1 said the money would arrive soon and that UC-1 would send a picture of it. MULTANI then said the cocaine was "here" and "ready."

On March 11, 2021, UC-2 met MULTANI in Sacramento and paid him $45,890 USD as payment for 1 KG of cocaine ($40,000) and payment of brokers' fees ($5,890) for the two prior 1 KG deals in the Toronto area on January 27 and February 12. Ranvir SINGH was also present during this meeting as a passenger in MULTANI's vehicle. Following this initial meeting, MULTANI and Ranvir SINGH left to pick up the cocaine. They went to Parampreet SINGH's Chevron gas station in West Sacramento (847 Harbor Boulevard) and went inside for a few minutes and then traveled to other locations before returning to the meeting location with UC-2. They returned in a different vehicle, this time driven by Ranvir SINGH with MULTANI as the passenger. MULTANI handed UC-2 the bag with the 1 KG of cocaine and they left. Lab testing confirmed the cocaine was cocaine with 86% purity. Leading up to and throughout this time, UC-1 was in frequent phone communication from Canada with both Parampreet SINGH and MULTANI, coordinating details of the meetings and ensuring that the transaction occurred. On March 16, Parampreet SINGH asked UC-1 to send a photograph of the cocaine UC-1 received to make sure it was the same brick they provided to UC-2.

///
///
///
///

***MULTANI Helps Coordinate Deal for 5 KG of Cocaine in Vancouver on April 7, 2021, on Behalf of Parampreet SINGH, and Gives Bulk Pricing for Orders of up to 50 KG of Cocaine; Authorities Seize the 5 KG of Cocaine from Parampreet SINGH's and MULTANI's Co-Conspirators Before the Deal Occurs***

On March 10, 2021, UC-1 and MULTANI had a lengthy WhatsApp call in which MULTANI pressed UC-1 on his connection to the Vancouver contact (UC-3) and expressed fears that UC-3 could be a "snitch." MULTANI also asked if UC-3 was going to order more cocaine and discussed bulk pricing for orders of 20, 30, and 50 KG of cocaine.

On March 13, 2021, MULTANI spoke with UC-1 and said UC-3 told him the prices were too high. He said he did not believe UC-3 would buy bulk and that his suppliers made fun of MULTANI when UC-3 ordered only 2 KG. He said UC-3 told him he sold the cocaine for $60,000 and MULTANI wondered why he wasn't breaking it down and selling it for $100,000 per KG. MULTANI said that the pricing would remain at $55,000 per KG for UC-3 because he and his drivers needed to be paid. He said Parampreet SINGH had told MULTANI to let UC-3 go as a buyer. MULTANI said he takes direction from Parampreet SINGH. They also discussed how MULTANI could deliver the same cocaine from California to anywhere in Canada. MULTANI claimed he was taking all the risk because he had to get the cocaine across the border.

Between March 10 and 18, 2021, MULTANI also negotiated pricing with UC-3 for a 20 KG cocaine deal. MULTANI told UC-3 he would sell 20 KG of cocaine in Sacramento, California, for $36,000 USD per kilogram.

On March 30, 2021, Sukhvir Singh (who had sold the cocaine to UC-3 in Vancouver on February 11 and March 6 on MULTANI's behalf) contacted UC-3 and said that MULTANI told him to follow up with UC-3. They continued discussions over the next week and, on April 6, 2021, Singh agreed to sell UC-3 5 KG of cocaine for $265,000 CAD the next day. MULTANI and UC-1 were in communication about the negotiation of this 5 KG cocaine deal during this time to ensure the deal took place.

On April 7, 2021, Singh and Dhaliwal arrived in Coquitlam (near Vancouver), Canada with the cocaine and messaged UC-3 that they were there and waiting. A few minutes later, MULTANI sent UC-3 a WhatsApp message that they were there with the cocaine and could not wait. Later that evening, law enforcement seized 5 KG of cocaine from a Louis Vuitton bag that Dhaliwal was carrying as he and Singh left their hotel room. Lab testing in Canada confirmed each KG brick was cocaine; one was 90% purity, one was 91% purity, and three were 92% purity.

***Parampreet SINGH and MULTANI Travel to Bakersfield to Meet with Purported Cocaine Suppliers***

Prior to March 17, 2021, two undercover officers posing as cocaine suppliers (UC-4 and UC-5) were put in contact with MULTANI. They arranged to meet with MULTANI on March 17, 2021, in Bakersfield, California, to discuss supplying cocaine to MULTANI in the future.

On the evening of March 16, UC-1 spoke with Parampreet SINGH, who told UC-1 he was headed to Bakersfield with MULTANI. Parampreet SINGH joked that while UC-1 was sitting comfortably, UC-1 was sending Parampreet SINGH and MULTANI to San Diego, LA, and Bakersfield. They then discussed the cocaine purchase from March 11, with UC-1 stating he sold the KG in Canada for $60,000 and that the buyers were happy. They then discussed future cocaine purchases by UC-1 and

Parampreet SINGH stated his people would not deal with buyers ordering less than 15 KG at a time. Parampreet SINGH said the same thing for opium—he required a minimum order of 15 KG. He then said he would send 30-40 KG of opium to UC-1 and asked UC-1 to convince the buyers to order 20 KG of cocaine this time.

During the time of this call, cell phone location data for Parampreet SINGH's and MULTANI's cell phones showed them traveling towards Bakersfield together.

On March 17, shortly before the scheduled meeting, MULTANI called UC-4 and said he had a buddy with him and that "we will not be talking about our numbers" (i.e., pricing) during the meeting. MULTANI and Parampreet SINGH then arrived together to the meeting. UC-4 asked about the quantity of cocaine MULTANI wanted to purchase and the location MULTANI wanted to distribute them, but could not elicit any responses from MULTANI without Parampreet SINGH interjecting that they would have a discussion about it later. MULTANI and Parampreet SINGH then left a few minutes after arriving at the meeting.

After this meeting, Parampreet SINGH and MULTANI stayed at a hotel in Fresno, California, on the night of March 17, 2021, before returning to Sacramento the next day. That same day, March 18, 2021, law enforcement requested information about Parampreet SINGH and MULTANI from hotel employees. Shortly thereafter, someone from the hotel contacted Parampreet SINGH and told him that "the feds" were asking about him. After this, Parampreet SINGH called MULTANI and Ranvir SINGH into his office and told them to delete any drug related photographs from the cell phones. Parampreet SINGH also directed MULTANI not to do business with UC-1 for at least a month.

I, Parampreet Singh, have reviewed the Factual Basis in Exhibit A and, as far as my own conduct is concerned, I adopt it as a true and correct statement of my conduct.

Dated: Aug 26, 2025

PARAMPREET SINGH, Defendant